## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC. and JOHN ROE,     Plaintiffs, | § § § § § | |
| v. | § § | CASE NO. 4:19-cv-1934 |
| JUDGE WAYNE MACK in his personal capacity and in his official judicial capacity on behalf of the State of Texas,     Defendants. | § § § § § | |

## COMPLAINT FOR DECLARATORY RELIEF

As a condition of appearing before the Honorable Wayne Mack, a Justice of the Peace in Justice Court 1 of Montgomery County, Texas, parties and attorneys must either participate in a courtroom-prayer practice or publicly protest the practice and invite adverse consequences from Judge Mack. The Plaintiffs—an attorney directly affected by the courtroom-prayer practice and a non-profit membership organization devoted to defending religious and nonreligious freedom through the preservation of the constitutional principle of separation of church and state—object to being put to that choice as a violation of the Establishment Clause of the First Amendment.

## I. NATURE OF THE CLAIMS

1. Plaintiffs bring this action pursuant to 42 U.S.C. §1983 to preserve the constitutional rights of the individual plaintiff and the organizational plaintiff's members, whose rights are being deprived under the color of state law by Judge Mack, a judicial officer.

2. Plaintiffs seek a declaration under 28 U.S.C. §2201 that Judge Mack, acting in both his personal capacity and his official capacity as a judicial officer for the State of Texas, is conducting a courtroom-prayer practice in violation of the Establishment Clause of the First Amendment.

3.     The Plaintiffs previously sued Judge Mack in his official capacity as a representative of Montgomery County regarding the courtroom-prayer practice at issue here, but the earlier case was dismissed because the Court concluded that the County lacked authority to redress the plaintiffs' injuries because the County was not responsible for actions taken by Judge Mack in his judicial capacity. *See FFRF v. Mack*, No. H-17-881, Mem. & Order at 7–15 (S.D. Tex. Sept. 27, 2018) (citing cases distinguishing between state judicial authority and municipal authority).

## II.  JURISDICTION AND VENUE

4.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331.

5.     The Court has the authority to order declaratory relief under 28 U.S.C. §2201.

6.     Venue is appropriate in the District Court for the Southern District of Texas pursuant to 28 U.S.C. §1391(e), as the events giving rise to this complaint occurred predominantly or entirely within the Southern District of Texas.

## III.  PARTIES

7.     Plaintiff Freedom From Religion Foundation, Inc. ("FFRF"), is a non-profit membership organization that advocates for the separation of state and church and educates the public on matters of nontheism. FFRF has more than 31,000 members, with members in every state of the United States, including more than 1,300 members living in the State of Texas. FFRF's membership has previously included multiple individuals with direct exposure to Judge Mack's courtroom-prayer practice and currently includes such members, including plaintiff John Roe.

8.     Plaintiff John Roe is a self-employed attorney who has regularly worked within Montgomery County since before Wayne Mack became a judge. Attorney Roe has appeared in Judge Mack's courtroom at least 20 times to represent different clients in at least 45 matters.

During each such appearance, Attorney Roe has been exposed to Judge Mack's courtroom-prayer practice.

9. Mr. Roe is religiously unaffiliated and objects to a government official telling him when or how to pray. Although government-organized prayer violates Mr. Roe's sincerely held beliefs, he has felt compelled to remain in the courtroom during the prayers during each of his courtroom appearances out of concern that leaving would bias Judge Mack against him and his clients.

10. "John Roe" is a pseudonym. In their Motion for Leave to Proceed Using Pseudonyms and for Protective Order, filed contemporaneously with this Complaint, Plaintiffs ask the Court to allow him to proceed pseudonymously for the remainder of this case.

11. The Defendants are Judge Wayne Mack in his personal capacity and in his capacity as a Justice of the Peace on behalf of the State of Texas.[1] Wayne Mack has served as the Justice of the Peace for Precinct 1 in Montgomery County since May 1, 2014. Judge Mack is the presiding officer of Justice Court 1 of Montgomery County and has jurisdiction over minor misdemeanor offenses (Class C) and civil matters where the amount in controversy does not exceed $10,000. He devised and implemented the prayer practice that is the subject of this action.

## IV. JUDGE MACK'S HISTORY OF ENDORSING CHRISTIANITY

12. During his initial campaign for Justice of the Peace of Montgomery County, Wayne Mack ran on a platform of instituting Christian values and starting a chaplaincy program within the Precinct 1 Court.

13. Wayne Mack's campaign fliers emphasized that he "majored in Theology" and "Served as [a] Sunday School teacher & Lay Youth Minister for 15 years." Under the heading

---

[1] Because Judge Wayne Mack is sued in two capacities, there are two Defendants. To alleviate confusion, when referring to both Defendants, Plaintiffs refer to "Judge Mack" or "Defendants." When referring to Wayne Mack in his individual capacity alone, Plaintiffs refer to "Wayne Mack."

"Continuing the Service" the fliers indicated that Wayne Mack "Believes in true Servant Leadership of Faith, Family and Freedom" and described him as a "Proven Servant Leader."

14.     Judge Mack was sworn in as a Justice of the Peace on May 1, 2014, and began reaching out to area chaplains to work within the Precinct 1 Court shortly thereafter.

15.     Since taking office, Judge Mack has attended numerous public and private events at which he has led Christian prayers while acting in his official capacity as a Justice of the Peace.

16.     Judge Mack has sent religious messages to his supporters, including a "Merry CHRISTmas" message (emphasis in original) that featured baby Jesus in a manger, quoted a passage from Isaiah—"His name shall be called Wonderful, Counselor, the Mighty God, the everlasting Father and Prince of Peace"—and was signed as coming from "Judge Wayne L. Mack and all our Justice Court One Staff."

17.     On October 23, 2014, Judge Mack held his first annual "Faith & Freedom Prayer Breakfast," which doubled as a fundraiser for his reelection campaign. At the prayer breakfast, Judge Mack remarked that "there is no reason as an elected official that I have to be ashamed to declare to this crowd and anybody listening that as the Justice of the Peace I *will* bring the Prince of Peace to work with me every day." Judge Mack's campaign website selected this remark for a highlight reel of the prayer breakfast.

18.     Judge Mack held another prayer breakfast on October 22, 2015, with keynote speaker Pastor Don Piper, who authored a book about visiting Heaven and meeting the Christian god. At this second annual prayer breakfast, Judge Mack proclaimed, and then later emphasized in the event highlights, "As a nation we must get back to the basics of Faith, Family & Freedom."

19.     Judge Mack hosted his third annual prayer breakfast on October 13, 2016; a fourth prayer breakfast on October 12, 2017; and a fifth prayer breakfast on October 11, 2018. Each of these breakfasts featured prayers of an exclusively Christian nature.

## V.  JUDGE MACK'S JUSTICE COURT CHAPLAINCY PROGRAM

20.     Shortly after assuming the office of Justice of the Peace on May 1, 2014, Judge Mack instituted a Justice Court Chaplaincy Program that would eventually serve as the primary source of the chaplains who deliver courtroom prayers.

21.     On June 19, 2014, Judge Mack sent over 100 letters, solely to Christian pastors in the area, on official Justice of the Peace Precinct 1 letterhead, inviting them to meet to discuss a chaplain program designed to serve the court system. The letter read in part, "I would ask you to prayerfully consider being a member of Pastoral Counsel." *See* Exhibit A.

22.     Many pastors responded to Judge Mack's invitation, including, for instance, Pastor Gregory Davis, who replied by email on July 14, 2014, with his regrets that he could not attend either meeting. Judge Mack's administrative assistant, Brandie Lopez, invited Pastor Davis to deliver the opening prayer in Judge Mack's court on July 29, 2014. Pastor Davis accepted and subsequently delivered the opening prayer.

23.     On September 4, 2014, Judge Mack sent a mass mailing, addressed to "Dear Reverend [name]," inviting recipients to attend one of two training sessions to become members of his "Justice Court Chaplaincy Program." The letter was signed "God bless you for your prayers and support and helping us make a difference, / Judge Wayne L. Mack." *See* Exhibit B.

24.     The first two Justice Court Chaplaincy Program training sessions occurred on September 15 and 18, 2014, at the Willis and Montgomery Justice Court #1 courtrooms, respectively.

25.     During these two 2014 training sessions, prospective court chaplains were either given a handbook or shown a Powerpoint presentation, both of which described the mission of the Justice Court Chaplaincy ("JCC"), the requirements to be a chaplain, and the duties of a chaplain, among other things.

26.     An opening slide to the presentation, entitled "Justice Court Chaplaincy Handbook" featured an image of a badge with a large Christian cross in the middle and the words "JUSTICE COURT," "CHAPLAIN," "MONTGOMERY COUNTY," and "PCT 1" on it. *See* Powerpoint excerpts, Exhibit C at 2.

27.     The "Introduction" slide to the presentation described the Justice Court Chaplaincy as a "ministry," while a separate slide entitled "Scope and Role of the Ministry" stated in part, "The role of the JCC Chaplain is to be a representative of God bearing witness to His hope, forgiving and redeeming power." Exhibit C at 3, 4.

28.     In the "Qualification and Requirements" section of the presentation, the slide entitled "Chaplains" included the requirement that chaplains "Maintain Biblical, ethical and moral standards." The same requirement was listed on the "Assistant Chaplains" slide. *See* Exhibit C at 5–7.

29.     Chaplains who completed a Justice Court Chaplaincy Program training session were then put on a list, maintained by the Precinct 1 Court at Judge Mack's request. Among other things, the list tracked whether each chaplain was willing to deliver prayers at the start of court sessions in the Precinct 1 Court's Willis and/or Montgomery locations.

30.     Judge Mack issued an official Justice Court Chaplain badge to each chaplain who completed a JCC Program training session. Chaplains would wear these badges while delivering prayers in Judge Mack's court. The original badge design featured a large Christian cross in the middle and included the words "JUSTICE COURT," "CHAPLAIN," "MONTGOMERY COUNTY," and "PCT 1" on them.

31.     The original chaplain badge design looked like this:



## VI.  JUDGE MACK'S ORIGINAL COURTROOM-PRAYER PRACTICE

32.     By July 2014, Judge Mack began opening court sessions with chaplain-led prayers.

33.     As of August 2014, the prayer practice began with Judge Mack entering and announcing that everyone should remain standing for a prayer.

34.     He then stated, "If any of you are offended by that you can leave into the hallway and your case will not be affected."

35.     Judge Mack then spent a few minutes describing his new Justice Court Chaplaincy Program, though no JCC Program training sessions would occur until mid-September.

36.     He then introduced the day's "visiting pastor" by outlining the chaplain's credentials and announcing which church he was from and where it was located.

37.     The guest chaplain then stood and read from the Christian Bible for five to eight minutes, directing this sermon to those present in the courtroom.

38.     During the sermon, Judge Mack appeared to study how those in attendance reacted to the Bible reading, whether they listened or expressed indifference.

39.     After the five- to eight-minute sermon, the guest chaplain asked everyone to bow their heads for a prayer. During the prayer, Judge Mack did not bow his head, but observed those in the courtroom.

40.     Once the prayer had concluded, everyone in the courtroom was instructed to remain standing during a recitation of the Pledge of Allegiance and the Texas Pledge of Allegiance to the state flag. Judge Mack then took his seat and the docket was called.

41.     After experiencing this prayer practice in August 2014 while appearing before Judge Mack as a litigant, one citizen reported to FFRF, "I felt that the Judge was watching for reactions from the courtroom; bowed heads, indifference etc. I definitely felt that our cases were to be affected by our reactions or lack of. I know I was not alone. Once the Bible reading was over we were then asked to bow our heads to pray. I was very uncomfortable and certainly felt that I was being coerced into following this ritual and that the outcome of my case depended upon my body language. . . . Although I did not leave as instructed 'if I was offended', no one in their right mind would have . . . ." FFRF's Complaint to the State Commission on Judicial Conduct, Exhibit D at 3.

## VII.   TEXAS OFFICIALS' REFUSAL TO PUT AN END TO JUDGE MACK'S COURTROOM PRAYERS

42.     On September 18, 2014, plaintiff FFRF sent a letter of complaint to Judge Mack, requesting that he voluntarily cease his courtroom-prayer practice. FFRF's letter described the August 2014 prayer practice, gave an example of how the prayers have created the appearance of bias within Judge Mack's courtroom, and provided legal citations showing why the practice violated the Establishment Clause of the First Amendment. *See* Exhibit D at 4–5. FFRF did not receive a response.

43.     On October 10, 2014, Judge Mack addressed an open letter to "Pastors & People of Faith" in which he called for congregations to join him at a Prayer Breakfast on October 23. He wrote in part, "Since we started our Chaplaincy Program and prayer in the opening ceremonies of our Court, we have come under national and local attack from those that believe that God & Faith has no place in public lives and service." He continued, "I want to make a statement to show those that feel what we are doing is unacceptable . . . that God has a place in all aspects of our lives and public service . . . ." *See* Exhibit D at 6.

44.     Following this announcement, on October 17, 2014, FFRF filed a complaint with the Texas State Commission on Judicial Conduct (Exhibit D).

45.     On October 18, 2014, in reaction to FFRF's complaint, Judge Mack wrote to area chaplains, "The complaint is a complete fabrication to further their [FFRF's] agenda. The information they provided never happened and would have been allowed to happen in our Court. But the truth is not what they seem to operate on. I believe we represent the local community interest on this issue and we will continue to do the right thing. I think we need to demonstrate that we represent the community on this issue . . . ."

46.     During the Commission's investigation, an attorney who regularly practices before Judge Mack contacted FFRF to report her objections to the courtroom-prayer practice. She subsequently drafted a letter to FFRF regarding her experiences in Judge Mack's courtroom, which she then, on or around August 31, 2015, submitted to the Commission as a supplement to its investigation. *See* Attorney Statement, Exhibit E (redactions added by FFRF for the purposes of this complaint).

47.     The attorney recounted three appearances in Judge Mack's courtroom, from September 2014, spring of 2015, and summer of 2015. She concluded by observing that Judge Mack "was so proud of his ceremonies that it would clearly be prejudicial to anyone who took

exception. If I had not been able to retreat to the back of the courtroom [to avoid being singled out for not participating], I don't know what I would have done. My participation was cowardly and something I am ashamed of, but appearing for a client constrained me to cooperate." Exhibit E.

48.    The State Commission's investigation of the courtroom prayers lasted over a year. Ultimately, in November 2015, the Commission declined to issue any form of discipline against Judge Mack, citing its lack of authority to decide whether the prayer practice violates the Establishment Clause. The Commission did, however, strongly caution Judge Mack to end his current prayer practice or substitute an opening practice consistent "with the perfunctory acknowledgement of religion that is accepted and employed by the United States Supreme Court and the Texas Supreme Court."

49.    Judge Mack did not follow the Commission's recommendation.

50.    Instead, Judge Mack interpreted the Commission's November 2015 decision as an attack on his personal religious beliefs.

51.    In an update sent to his supporters summarizing his achievements during his first 777 days in office, Judge Mack began by reflecting on the chaplaincy program and the Commission's decision: "What we quickly learned is that the program that I wanted in place was a program that God wanted in place, for His larger purpose. There are those local haters among us, backed by bureaucrats in Austin and reinforced by well funded national organizations who exist for the purpose of removing our **basic religious freedoms**." He went on, "We are staying the course, fighting for what we believe is right, for the values and freedoms we hold dear. **Faith and Freedom. The first rounds of the fight were won handily.** Atheists brought a complaint to the Judicial Conduct Commission, while it proved to be without merit, sympathetic bureaucrats without authority directed that the programs be ended." *See* Exhibit F at 1 (emphasis in original).

52.     On May 13, 2016, another citizen, a *pro se* litigant in the Precinct 1 Court, filed a judicial conduct complaint with the Commission against Judge Mack based in part on her observations of the courtroom-prayer practice and her view that Judge Mack was not being impartial about religion. She recounted that after Judge Mack introduced the chaplain, "we were told to bow our heads for prayer. Never once did the judge or the preacher say 'you may step out if you do not want to participate' not once. I believe in prayer but I also believe in the [C]onstitution and I believe it should be [upheld] especially in our courts. During the prayer I opened my eyes and looked right at the judge he did NOT have his head bowed or eyes closed, he was scanning the [courtroom], looking at each individual person. I was appalled and worried because me and the judge made eye contact during the prayer, I just shook my head and replied amen, as the preacher said now everyone say amen." Exhibit G at 2–3 (redactions added by FFRF for the purposes of this complaint).

53.     The Commission took no action regarding Judge Mack's courtroom-prayer practice in response to this complaint.

54.     Subsequent to the Commission's decision, in February 2016, Lieutenant Governor Dan Patrick and the Commission's Executive Director, Seana Willing, independently requested that the Office of the Attorney General issue an opinion regarding the constitutionality of Judge Mack's courtroom prayer practice.

55.     Shortly thereafter, FFRF learned of the Attorney General's intent to issue an opinion and submitted a brief on April 21, 2016, arguing that Judge Mack's courtroom prayer practice is unconstitutional. *See* FFRF's brief to the Attorney General, Exhibit H.

56.     On August 15, 2016, Attorney General Paxton issued Opinion No. KP-0109, in which he indicated that it is the opinion of the Office of the Attorney General that a justice of the

peace opening daily court proceedings with a prayer by a volunteer chaplain does not violate the Establishment Clause.

57.     Attorney General Paxton's opinion was based on assumed facts as outlined in the Lieutenant Governor's letter requesting an opinion —facts that do not reflect the actual origin and purpose behind Judge Mack's courtroom-prayer practice.

58.     The Attorney General's opinion did not address the evidence submitted to the State Commission that many people in Judge Mack's courtroom have been coerced into participating in the opening prayer. Nor did it address the in-depth analysis in FFRF's brief to the Attorney General, submitted nearly four months before the opinion was issued.

59.     In reaction to the Attorney General opinion, Judge Mack wrote to his supporters, "Because of the Lord we have won this battle, but the war of the attack on our religious freedoms continues. And we will stay the course with HIS help and your support." *See* Exhibit F at 4.

60.     If a court were to declare that Judge Mack's courtroom-prayer practice violates the law, it would be within the Commission's power to discipline Judge Mack if he continued acting in violation of that declaration.

## VIII.   JUDGE MACK'S REVISED COURTROOM-PRAYER PRACTICE

61.     For at least one year after Judge Mack started the Justice Court Chaplaincy Program training sessions (i.e., the period encompassing the majority of the Commission's investigation), the JCC Handbook underwent some minor changes but remained largely as described above.

62.     The September 2015 version of the Handbook included the same badge with the Christian cross on its front page, the same introductory statement describing the JCC as a "ministry," and the same sentence under "Scope and Role of the Ministry" reading, "The role of the JCC Chaplain is to be a representative of God bearing witness to His hope, forgiving and redeeming power." *See* September 2015 Handbook excerpts, Exhibit C at 8–9.

63.     Judge Mack used the Christian cross badge with "Justice Court," "Chaplain," Montgomery County," and "PCT 1" on it to advertise his second annual Prayer Breakfast, which took place on October 22, 2015. *See* Exhibit F at 6.

64.     Thereafter, however, the JCC Handbook was revised in some respects. The picture of the Christian cross, the statement that the program was designed as a "ministry," and the expression of the expectation that participating chaplains "be a representative of God" and bear witness to God's "hope and [His] forgiving and redeeming power," were removed.

65.     By spring 2015, Judge Mack had begun revising his courtroom-prayer practice. The revised practice, as described below, may vary slightly day-to-day, but has remained largely consistent ever since.

66.     Now, after attorneys have indicated their presence in the courtroom and after the docket has been called, but before Judge Mack has entered, the bailiff or court clerk calls for the attention of those assembled in the courtroom and gives a brief introductory statement describing the prayer practice. That announcement is supposed to include a statement that those opposed to prayer may leave the courtroom without affecting the outcome of their cases, although the invitation to leave has not been consistently included.

67.     After the introduction, Judge Mack enters the courtroom. While everyone remains standing, Judge Mack talks briefly about his Justice Court Chaplaincy Program and introduces a chaplain from the program.

68.     The chaplain wears an official badge issued by Judge Mack. The revised badge no longer includes a Christian cross, but instead features a version of the official Texas State Seal and the words "Justice Court," "Chaplain," "Montgomery County," and "Texas" on them.

69.     The current chaplain badges look like this:



70.     After Judge Mack's introduction, the chaplain leads a prayer. The prayers are directed to those in attendance in the courtroom and everyone present is asked to participate, or show obeisance, by bowing their heads.

71.     After the chaplain-led prayer, attendees are encouraged to recite the Pledge of Allegiance and the Texas Pledge of Allegiance to the state flag.

72.     The bailiff then announces the rules of the court and the first case is called.

73.     During the introduction, the chaplain-led prayer, and the courtroom business that follows, the courtroom doors remain magnetically locked. To exit, a person must push a button and reentry can only be granted by someone already inside the courtroom. Those seeking reentry after the prayers would need to draw attention to themselves by knocking on the courtroom doors. Because Judge Mack enters the courtroom after the introduction, he has ample opportunity to note who enters the courtroom after the prayer.

74.     Judge Mack requested that magnetic locks be added to his courtroom doors. He is the only Justice of the Peace in Montgomery County, or indeed, any surrounding county, who

locks his courtroom doors in this manner. Judge Mack began locking his courtroom doors at approximately the same time he revised his courtroom-prayer practice.

75.     Because the docket is called prior to the prayer, all attorneys present in the courtroom have been logged. Judge Mack therefore has access to a record of those attorneys present in the courtroom when the invitation to leave the courtroom during the prayer practice is announced.

76.     The Precinct 1 court contains signs reading as follows:

> PLEASE READ BEFORE ENTERING THE COURT ROOM [*sic*]:
> IT IS THE TRADITION OF THIS COURT TO HAVE A BRIEF OPENING CEREMONY THAT INCLUDES A BRIEF INVOCATION BY ONE OF OUR VOLUNTEER CHAPLAINS AND PLEDGES TO THE UNITED STATES AND TEXAS STATE FLAG.
> YOU ARE NOT REQUIRED TO BE PRESENT OR PARTICIPATE.
> THE BAILIFF WILL NOTIFY THE LOBBY WHEN COURT IS IN SESSION
> SEE BAILIFF OR A COURT CLERK IF YOU HAVE ANY QUESTIONS

77.     Prior to the start of court, a nearly identical message is displayed on a TV screen at the back of Judge Mack's courtroom.

78.     The Precinct 1 Court maintains a master list of chaplains participating in the Justice Court Chaplaincy Program. One piece of information tracked on that list is whether each chaplain is willing to deliver opening prayers in the Precinct 1 Court's Willis location and/or Montgomery location.

79.     To find and schedule chaplains to deliver prayers in Judge Mack's courtroom, a Precinct 1 Court employee periodically emails the list of chaplains who are willing to deliver courtroom prayers. The email includes a list of available docket dates. The chaplains respond and are scheduled by the Court on a first come, first served basis.

80.     Sometimes, at Judge Mack's direction, additional chaplains who are not affiliated with the Justice Court Chaplain Program are added to the schedule.

## IX.  ATTORNEY ROE'S EXPOSURE TO THE COURTROOM-PRAYER PRACTICE

81.    Plaintiff John Roe has been present in Judge Mack's courtroom during the revised, post-spring 2015 prayer practice on many occasions, including when Judge Mack was hearing an entirely juvenile docket. On each of these occasions, Attorney Roe was exposed to a courtroom prayer led by a Christian chaplain.

82.    All of the prayers witnessed by Attorney Roe in Judge Mack's courtroom and all the prayers otherwise brought to the attention of FFRF by those in attendance have been sectarian prayers, delivered by Christians, in the name of Jesus.

83.    Attorney Roe recalls a typical opening prayer from December 2016, when he observed the courtroom-prayer practice along with about thirty *pro se* litigants and ten attorneys. Not a single person left the courtroom after the bailiff announced the opportunity to absent oneself during the prayer.

84.    Attorney Roe appeared before Judge Mack at least three times in the summer of 2017, during which he represented at least ten different clients before the judge.

85.    On one occasion, in mid-June, 2017, prior to the start of court, Attorney Roe was in the courthouse but not yet in the courtroom, negotiating a settlement with a *pro se* litigant. The Clerk of Court entered the room and instructed Attorney Roe and the *pro se* litigant that they "need[ed]" to enter the courtroom to participate in the prayer. This was not framed as a request, but as a demand. Mr. Roe complied because he believes that publicly registering his objection to the courtroom-prayer practice would jeopardize his business, insofar as it would bias Judge Mack against him and his clients.

86.    Subsequent to his 2017 appearances in Judge Mack's courtroom, Attorney Roe decided that he no longer wished to compromise his sincerely held beliefs by continuing to participate in Judge Mack's courtroom-prayer practice. But because Roe does not wish to

jeopardize any client's case by appearing before Judge Mack without having participated in the prayer, Attorney Roe has elected to no longer represent clients before Judge Mack.

87.     Attorney Roe has had to decline business in order to avoid appearing in Judge Mack's courtroom.

88.     On some matters, where a district court has concurrent jurisdiction with Judge Mack's court, Attorney Roe has elected to bring claims in the district court instead of Judge Mack's court, despite the higher filing fees, higher service fees, and the generally slower docket, in order to avoid Judge Mack's courtroom-prayer practice.

89.     If Judge Mack's courtroom-prayer practice were discontinued, Attorney Roe would resume practicing within the Precinct 1 court.

## X.  JUDGE MACK'S COURTROOM PRAYER PRACTICE VIOLATES THE UNITED STATES CONSTITUTION

90.     Through his courtroom-prayer practice, Judge Mack has violated the rights of Attorney Roe and all other citizens appearing in the Precinct 1 Court to be free from religious endorsement by the government.

91.     Judge Mack's courtroom-prayer practice unambiguously and unnecessarily endorses religion in general and Christianity in particular, and places the State's imprimatur on religion in general and Christianity in particular, in violation of the Establishment Clause of the First Amendment to the U.S. Constitution.

92.     Judge Mack's goal and objective in implementing his courtroom prayer practice was to mark the start of each Precinct 1 Court session with Christian prayer. The purpose of the prayer practice is to advance Judge Mack's personal religious ideology through his judicial office.

93.     The primary effect of the courtroom prayer practice is to advance religion in general, and Christianity specifically, through the machinery of the Precinct 1 Court and to coerce audience participation in Christian prayer.

94.     Due to the prayer practice, Judge Mack's courtroom has become excessively entangled with an exclusively religious ritual.

95.     Through his actions and public statements, Judge Mack has created the unambiguous impression that he, acting in his official capacity as Justice of the Peace for Montgomery County, endorses religion over nonreligion and Christianity over other faiths.

96.     Due to his considerable influence and power as a Justice of the Peace, Judge Mack has coerced Attorney Roe and others to participate in his religious practice.

97.     Judge Mack's prayer practice is not in keeping with the ceremonial proceedings exercised by the Texas Supreme Court or the U.S. Supreme Court and is otherwise unsupported by historical judicial practices.

## XI.  REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs request judgment against the Defendants as follows:

a)      Judgment declaring that Judge Mack's courtroom prayer practice violates the Establishment Clause of the First Amendment to the United States Constitution or, in the event declaratory relief is unavailable, injunctive relief ordering Judge Mack to discontinue his courtroom prayer practice; and

b)      Judgment awarding Plaintiffs their reasonable attorneys' fees and costs against Judge Mack in his official capacity only, pursuant to 42 U.S.C. § 1988; and

c)      Judgment awarding or ordering such further relief as the Court deems just and equitable.

Respectfully submitted,

/s/ Sam Grover
Sam Grover
Wisconsin State Bar No. 1096047
Elizabeth Cavell (*motion for admission* pro hac vice *pending*)
Wisconsin State Bar No. 1089353

FREEDOM FROM RELIGION FOUNDATION, INC.
P. O. Box 750
Madison, Wisconsin 53701
Telephone:  608-256-8900
Telecopier:  608-204-0422
Email:  sgrover@ffrf.org / ecavell@ffrf.org

Ayesha Khan (*motion for admission* pro hac vice *pending*)
D.C. Bar No. 426836
Telephone: 301-246-0346
Fax: (216) 927-2558
Email: khan@clarionfirm.com