UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC. and JOHN ROE, <br>       Plaintiffs, <br><br> v. <br><br> JUDGE WAYNE MACK in his personal capacity and in his official judicial capacity on behalf of the State of Texas, <br>       Defendants. | § § § § § § § § § § § § | CASE NO. 4:19-cv-1934 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO PROCEED USING PSEUDONYMS AND FOR PROTECTIVE ORDER**

**I.     INTRODUCTION**

Judge Mack has implemented a courtroom-prayer practice during which a guest chaplain delivers a prayer to those assembled in his courtroom before the start of each court session. Plaintiffs object to this courtroom-prayer practice as a violation of the Establishment Clause of the First Amendment. The individual plaintiff, Attorney John Roe, has filed this lawsuit using a pseudonym rather than his true identity. Attorney Roe is a citizen and resident of Texas who has been subjected to Judge Wayne Mack's courtroom-prayer practice on many occasions and has now altered his conduct, at great personal expense, in order to avoid the prayer practice. Plaintiffs aver that if Attorney Roe's identity is disclosed, he will be subject to adverse consequences. Plaintiffs feel that they have no choice but to challenge Judge Mack's intrusive proselytizing, both for the sake of Attorney Roe and in the interest of the general public. Due to the highly personal and sensitive nature of the religious matters involved in this case, and the potential for retribution against Attorney Roe, he seeks to proceed pseudonymously.

## II. ARGUMENT

### A. This Court has to power to allow Attorney Roe to use a pseudonym.

Generally, pleadings must disclose the identities of the litigants. *See* Fed. R. Civ. P. 10(a) ("[T]he title of the complaint must name all the parties...."). But courts have the power to allow plaintiffs to use pseudonyms. *See, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973); *Doe v. Bolton*, 410 U.S. 179 (1973); *Poe v. Ullman*, 367 U.S. 497 (1961); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294 (2000); *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981); *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992); *Doe v. Barrow Cty.*, 219 F.R.D. 189, 190 (N.D. Ga. 2003).

Federal courts, including the Fifth Circuit, often grant pseudonym motions in cases involving organized prayers and religion in public settings. *See, e.g.*, *Stegall*, 653 F.2d at 184–86 (5th Circuit) (allowing pseudonyms in challenge to public-school bible readings); *Santa Fe*, 530 U.S. 290 (finding school-sponsored football game prayers unconstitutional in pseudonymous challenge); *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 853 (7th Cir. 2012) (*en banc*) (holding that public school graduation in church was unconstitutional), *cert. denied*, 134 U. S. 2283 (2014); *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004) (holding that public schools cannot teach the Christian bible as religious truth).

### B. The relevant factors favor allowing Attorney Roe to use a pseudonym.

To decide whether plaintiffs may proceed using pseudonyms, the Fifth Circuit "requires a balancing of considerations calling for maintenance of a party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Stegall*, 653 F.2d at 186. In *Stegall* the court began its analysis by identifying three factors, which it clarified are not prerequisites to maintaining anonymity, which had been used previously and must be given "considerable weight." *Id.* at 185–86. Those factors are: (1) whether plaintiffs seeking anonymity

are suing to challenge a governmental activity; (2) whether prosecution of the suit will compel plaintiffs to disclose information of the utmost intimacy; and (3) whether plaintiffs are compelled to admit an intent to engage in illegal conduct. *Id.* After assessing the initial three factors, the Fifth Circuit went further and identified additional considerations, including public reaction and retaliation ("the Does may expect extensive harassment—and perhaps even violent reprisals" and "their personal beliefs and practices . . . have invited an opprobrium analogous to the infamy associated with criminal behavior"); and the "special vulnerability" of the plaintiffs, who were children. *Id.*

In this case, the initial *Stegall* factors and additional considerations weigh in favor of pseudonymity and a protective order. Attorney Roe is (1) suing a governmental entity; and (2) will be forced to reveal information of the "utmost intimacy." Moreover, anticipated public reaction and retaliation, based on the history of harassment and violence against Establishment Clause plaintiffs, supports the need for anonymity. Conversely, the Defendants and the public stand to gain very little by publicly identifying the individual plaintiff in this lawsuit.

    C.    **<u>Plaintiffs are challenging a governmental activity.</u>**

The Plaintiffs are suing Judge Wayne Mack for actions taken in his role as a judicial officer on behalf of the State of Texas. In this instance there is a greater public interest in ensuring that the government complies with the Constitution than in knowing which citizens are seeking that compliance. The public has a considerable interest in ensuring that the people who occupy government offices do not disregard their duty in order to pursue their own interests or promote their personal religious beliefs while acting in their official capacity.

**D.     Attorney Roe will be forced to reveal information of the "utmost intimacy" if he is required to proceed without a pseudonym.**

In the course of this suit, Attorney Roe will be forced to reveal information about his personal religious beliefs, or lack thereof, and his views on separation of church and state— information of the "utmost intimacy." In *Stegall*, the Fifth Circuit recognized that "religion is perhaps the quintessentially private matter." 653 F.2d at 186. The court reasoned, "Although they do not confess either illegal acts or purposes, the Does have, by filing suit, made revelations about their personal beliefs and practices that are shown to have invited an opprobrium analogous to the infamy associated with criminal behavior." *Id.* Without a pseudonym, this intensely private information will be made public for all in Montgomery County and the rest of Texas to judge.

In addition to having to "directly state [his] religious affiliations, or lack thereof," Attorney Roe will have to explain his injuries—a requisite element to prove standing—which will necessarily "require him to reveal his beliefs concerning the proper interaction between government and religion." *Barrow Cty.*, 219 F.R.D. at 193. "The court recognizes that such concerns can implicate privacy matters similar to those associated with actual religious teachings and beliefs." *Id.* As the Supreme Court has put it, the "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere." *Lee v. Weisman*, 505 U.S. 577, 589 (1992). Citizens, including Attorney Roe, should not be forced to air publicly their quintessentially private religious beliefs in order to challenge a government actor who has chosen to comingle his personal religious beliefs with public business.

E. **Attorney Roe risk harassment, intimidation, and violence if his identity becomes public.**

As with other citizens challenging Establishment Clause violations, Attorney Roe faces a very real threat to his physical and mental wellbeing, as well as to the safety of his family and property.

The recognition of this fact led the Sixth Circuit to note in *Doe v. Porter*, where plaintiffs sought to enjoin religious instruction in public schools, that religious issues are uniquely controversial; the Sixth Circuit therefore found that forcing the plaintiffs to reveal their identities could "subject them to considerable harassment." 370 F.3d at 561. This is typical in Establishment Clause cases.

History has shown that there is a unique risk inherent to bringing Establishment Clause challenges, which typically involve highly charged religious issues. "Lawsuits involving religion can implicate deeply held beliefs and provoke intense emotional responses." *Doe ex rel Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710, 723 (7th Cir. 2011), *vacated by* 678 F.3d 840 (7th Cir. 2012) (adopting opinion on issue of justiciability and anonymity).

When Vashti McCollum sued her employer, a public school, in 1945 because the school allowed students to attend religious classes held in classrooms, she was fired, her house was vandalized, she received more than one thousand letters of hate, and her sons were assaulted. *See Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948); Benjamin P. Edwards, *When Fear Rules in Law's Place: Pseudonymous Litigation as a Response to Systematic Intimidation*, 20 VA. J. SOC. POL'Y & L. 437, 456–57 (2013); Robert S. Alley, WITHOUT A PRAYER: RELIGIOUS EXPRESSION IN PUBLIC SCHOOLS 84–89 (1996).

In 1981, Joann Bell and Lucille McCord filed suit to block prayer sessions and the distribution of Gideon Bibles in their children's schools. *See Bell v. Little Axe Indep. Sch. Dist. No.*

*70*, 766 F.2d 1391 (10th Cir. 1985). The plaintiffs' children, who regularly attended Christian churches, were branded "devil worshipers." Edwards at 457 n.124; Alley at 106. "An upside-down cross was hung on thirteen-year-old Robert McCord's locker" and the Bells received threatening phone calls. Alley at 106. "More than once a caller said he . . . was going to break in the house, tie up the children, rape their mother in front of them, and then 'bring her to Jesus.'" *Id.* at 107–08. The threats were not empty: the Bells' home was burned down. *Id.*

In 1994, Lisa Herdahl challenged prayer practices in her children's schools. *See Herdahl v. Pontotoc Cnty. Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995). As a result, her children were called "atheists and devil worshipers" by their classmates. Stephanie Saul, *A Lonely Battle in Bible Belt: A Mother Fights to Halt Prayer at Miss. School*, Newsday, Mar. 13, 1995, at A8. Lisa was a Christian Scientist and her husband a Lutheran. Alley at 178. Other parents threatened to beat their own children if they were caught talking to, or playing with, the Herdahl children. Alley at 177. There were reports that a boycott would be organized against the convenience store where Lisa Herdahl worked. Saul at A08. Herdahl gave up her job "because of threats against her children." Alley at 182. She received death threats and threats that her home would be firebombed. *Id.* at 186.

The plaintiff's son in *Chandler v. Siegelman*, 230 F.3d 1313 (11th Cir. 2000) (challenging prayer at school-related events), was "harassed at school almost daily." Jonathan Ringel, *Alabama Claims U.S. Court Order Denies Students' Right to Pray*, Fulton County Daily Rep., Dec. 4, 1998, at 1. And even though she was not a plaintiff but merely a vocal opponent of the school-prayer policy challenged in *Santa Fe*, 530 U.S. 290, Debbie Mason received threatening phone calls and was followed home by people trying to intimidate her. Kenny Byrd, *Baptist Family Opposed to Football Prayer Feels Pressure*, BAPTIST STANDARD (June 12, 2000). Her family was unable to find work in their own town. *Id.*

Likewise, Tammy Kitzmiller, the lead plaintiff in a high-profile case challenging a Pennsylvania school district's promotion of intelligent design, received hate mail and death threats. *Judgment Day: Intelligent Design on Trial* (PBS *NOVA* television broadcast Nov. 13, 2007); *see generally, Kitzmiller v. Dover Area Sch. Dist.*, 400 F. Supp. 2d 707, 721–22 (M.D. Pa. 2005). New Jersey high-school student Matthew LaClair also received a death threat after he tape-recorded and publically objected to his history teacher's frequent proselytizing of students. Tina Kelly, *Talk in Class Turns to God, Setting Off Public Debate on Rights*, N.Y. Times, Dec. 18, 2006, at B1. After speaking out, LaClair was ostracized. Matthew LaClair, *Scholarship Essay*, www.aclu.org/students/34399res20080314.html.

Proxy violence—violence against plaintiffs' pets to send the message that they are next—is also common. The McCollum's family cat was "lynched;" the McCord's prize goats were "slashed and mutilated;" every squirrel in the Maddox's yard was shot and the corpses hung from trees; and Darla Wynne's cats were killed, hung from a tree, and gutted, her dog was beaten, and her parrot beheaded—a note, "You're next," attached to the severed head. Edwards at 457, 458, 466; Christina Lee Knauss, *A Quiet Life No More*, The State, Sept. 19, 2004, at D1; Jack Kilpatrick, *Wiccan's Case Reveals Town's Intolerance*, Deseret News, Aug. 14, 2004. The Harris's "two pet cats were poisoned and died as the family watched helplessly." Alley at 141.

Violence is also directed at the plaintiffs themselves. Tyler Deveney, the eighteen year-old plaintiff in *Deveney v. Bd. of Educ.*, 231 F. Supp. 2d 483 (S.D. W. Va. 2002), was assaulted after successfully challenging the invocation planned for his high-school graduation ceremony. *See* Charles Shumaker, *Student Beaten for Prayer Suit*, *He Says*, Charleston Gazette & Daily Mail, June 19, 2002, at 6D. Eight teens evidently displeased with Deveney for upholding the First

Amendment attacked Deveney in a public place, with one saying, "Oh, you hate God," before punching Deveney in the face. *Id.*

The Dobrich family—plaintiffs in *Dobrich v. Walls*, 380 F. Supp. 366 (D. Del. 2005)—suffered so much harassment, anti-Semitic taunts, and threats that they were forced to move, after challenging their public school district's practices allowing teachers to proselytize and distribute bibles. *See* David Bario, *A Lesson in Tolerance*, Am. Lawyer, July 2008, at 122.

In a Seventh Circuit case challenging a city's display of Christian paintings, Judge Cudahy described events surrounding the substitution of a new, anonymous plaintiff for the named one:

> The record indicates that the original plaintiff in this case, Richard Rohrer, was, in effect, ridden out of town on a rail for daring to complain about the City's conduct. The present plaintiff has concealed her identity to avoid suffering the same treatment. However much some citizens of Ottawa may disagree with the position that the Plaintiffs have taken, however, much they may think the Plaintiffs annoying and overlitigious, the conduct of some of them has been deplorable.

*Doe v. Small*, 964 F.2d 611, 626 (7th Cir. 1992) (Cudahy, J., concurring) (citations omitted).

In 2010–2012, a young girl, a high school student in liberal Rhode Island, was reviled in her community for challenging her high school's prayer banner. Jessica Ahlquist faced "bullying and threats at school, on her way home from school and online." *Ahlquist v. City of Cranston ex rel. Strom*, 840 F. Supp. 507, 516 (D.R.I. 2012). She was "subject to frequent taunting and threats at school, as well as a virtual online hate campaign via Facebook." *Id.* Jessica's state representative, Peter Palumbo, called her an "evil little thing" on the radio and florists refused to deliver flowers FFRF ordered for Jessica. Edwards at 458–60. Jessica eventually needed a police escort to attend public meetings and class. *Id.*

The threats to Jessica did not end with the court case. Four months after the court decided in her favor, she received a letter reading in part: "Get the fuck out of R.I. you bitch whore. You are nothing more than a sex-toy of a slut. Maybe you will [be] gang-banged before we throw you

out of one of our cars. WE WILL GET YOU— LOOK OUT!" *See* Edwards at 460 for the full letter.

As this history shows, the retaliation against Establishment Clause plaintiffs—arson, assault, attacks on family, intimidation, attacks on businesses and employment, public humiliation, proxy violence against pets, and much more—is far worse than what a typical plaintiff faces.

### F. Attorney Roe has a reasonable fear of facing retaliation based on both the history mentioned above and based on the actions of Judge Mack.

"To proceed anonymously for fear of retaliation and harassment a 'plaintiff must demonstrate that . . . retaliation is not merely hypothetical but based in some real-word evidence; a simple fear is insufficient." *Does v. Snyder*, No. 12-11194, 2012 WL 1344412 (E.D. Mich. Apr. 18, 2012). Plaintiffs have documented evidence that supports their fears that being publicly identified will subject Attorney Roe to retaliation, both from Judge Mack and from members of the public.

Plaintiffs have a well-founded fear that Judge Mack may retaliate against Attorney Roe if Roe's identity is made known to him. During the investigation into Judge Mack's courtroom-prayer practice by the State Commission on Judicial Conduct, the Commission's Executive Director, Seana Willing, alerted plaintiff FFRF to behavior by Judge Mack indicating that he actively attempted to identify FFRF's complainant and the attorney who represented the complainant in Judge Mack's courtroom. Though the Commission went to great lengths to maintain FFRF's complainant's anonymity during the investigation, Judge Mack provided Executive Director Willing with a description and copy of a Facebook post, written by a private citizen, from which Judge Mack claimed he was able to deduce the identity of FFRF's complainant and his or her attorney. The Facebook post did not name FFRF's complainant or the complainant's attorney, or provide any identifying information, yet Judge Mack was confident that he had

identified them. *See* Declaration of FFRF Associate Counsel Sam Grover, ¶¶ 4–8. Judge Mack did not need to determine FFRF's complainant's identity in order to respond to the Commission's inquiry, yet he went out of his way to find this information.

Judge Mack's behavior during the State Commission investigation is particularly concerning, given how he has galvanized the Montgomery County community against FFRF and individuals who oppose his courtroom-prayer practice. In an advertisement for his first annual Prayer Breakfast on October 10, 2014, Judge Mack characterized FFRF's complaint as a "national and local attack from those that believe that God & Faith has no place in public lives and service." *See* Complaint, Exhibit D, at 6. Plaintiffs are aware that during his 2014 prayer breakfast, Judge Mack characterized FFRF's challenge as an attack on religion and as part of a "war" on Christianity. Rather than maintaining the level of impartiality one might expect from a judge, he adopted a tone that created a clear division within the community between those who agreed with him, and were thus morally superior, and those who disagreed with him, and were thus evil atheists. *See* Declaration of John Roe, ¶¶ 6–7.

Judge Mack has continued using divisive rhetoric to describe those who object to his courtroom-prayer practice ever since. In an advertisement for his 2016 Prayer Breakfast, Judge Mack characterized the opposition to his courtroom-prayer practice as follows: "There are those local haters among us, backed by bureaucrats in Austin and reinforced by well funded national organizations who exist for the purpose of removing our **basic religious freedoms.**" *See* Complaint Exhibit F at 1 (emphasis in original). After Attorney General Paxton issued Opinion No. KP-0109, approving of the prayer practice, Judge Mack wrote to his supporters, "Because of the Lord we have won this battle, but the war of the attack on our religious freedoms continues. And we will stay the course with HIS help and your support." *See* Complaint Exhibit F at 4.

The greater community has echoed the divisive rhetoric espoused by Judge Mack. *See* Declaration of John Roe, ¶¶ 5, 7. This negative public perception creates real-world safety concerns for Attorney Roe, based on the history of violence against Establishment Clause plaintiffs outlined above.

Mr. Roe's identity as an atheist and his views on the separation of religion and government are quintessentially private. Were he to be publicly identified, he would likely face prejudice for these views and beliefs. Being publicly identified has similar safety implications for Mr. Roe's family and would also have other practical implications.

For John Roe, being publicly identified would adversely impact his professional career. Mr. Roe is a self-employed attorney who works within Montgomery County. *See* Declaration of John Roe, ¶¶ 13–14. Were his identity as religiously unaffiliated to become public knowledge, his business would undoubtedly suffer. As described above, litigation history is replete with examples of public efforts to punish the businesses and professional careers of plaintiffs in Establishment Clause cases. *E.g.*, Edwards at 456–58 (noting that Ms. McCollum was fired for challenging classroom religious instruction in *McCollum v. Bd. of Educ.*); Saul at A08 (describing public efforts to boycott Lisa Herdahl's business for her participation in *Herdahl v. Pontotoc Cty. Sch. Dist.*, 887 F. Supp. 902 (N.D. Miss. 1995)); Byrd, BAPTIST STANDARD (describing inability of Debbie Mason and her family to find work in their own town after she vocally opposed the school prayer policy challenged in *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)).

For the foregoing reasons, Plaintiffs' fears are well-founded. These fears are based on real-world evidence, both their experiences with Judge Mack and in viewing the specific reactions from the Montgomery County community, and by looking to the treatment of plaintiffs in other recent Establishment Clause cases.

### G. There is no potential unfairness to the Defendants and the minimal public interest considerations do not override the need for pseudonymity.

In opposition to the above-mentioned factors, the Court must consider "the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Stegall*, 653 F.2d at 186. While customarily courts favor openness, much of this custom stems from practical considerations, like the importance of defendants knowing plaintiffs' identities in order to develop a robust defense. Federal courts recognize that "[i]t is also relevant to consider whether the defendants are being forced to proceed with insufficient information to present their arguments against the plaintiff's case." *Citizens for a Strong Ohio v. Marsh*, 123 F. App'x 630, 636 (6th Cir. 2005) (citing *Doe v. Porter*, 370 F.3d 558, 561 (6th Cir. 2004)).

When there is little risk of prejudice to defendants, a considerable weight is lifted from the side of the scales opposed to anonymity. *See, e.g.*, *Barrow Cty.*, 219 F.R.D. at 194 ("The court notes that the inconvenience to defendants should be relatively low. This is not a case that will be determined by plaintiff's credibility or recitation of facts. Rather, as long as plaintiff has standing to sue, this case will depend on the resolution of a legal question: Does the display of the Ten Commandments in the county courthouse violate the Constitution?"). In this case, allowing Mr. Roe to proceed anonymously will not prejudice the Defendants. There are no foreseeable disputes over material facts in this case that hinge on Mr. Roe's identity. In fact, Plaintiffs anticipate no disagreements over the material facts at all.

Additionally, the presumption of openness in judicial proceedings is "constitutionally-embedded" in the sense that First Amendment guarantees are implicated. *See Richmond Newspapers, Inc. v. Virginia*, 488 U.S. 555 (1980) (addressing the closure of a criminal trial to the public); *but see Doe v. Sante Fe Indep. Sch. Dist.*, 933 F. Supp. 647, 649–50 (S.D. Tex. July 22, 1996) (noting that while some Circuit Courts have extended the *Richmond Newspaper* holding to

civil trials, the issue remains unresolved by the Supreme Court). But, as the Fifth Circuit has noted, "[t]he equation linking the public's right to attend trials and the public's right to know the identity of the parties is not perfectly symmetrical. The public right to scrutinize governmental functioning is not so completely impaired by a grant of anonymity to a party as it is by closure of the trial itself." *Stegall*, 653 F.2d at 185. In recognition of this distinction, some federal courts have allowed plaintiffs to proceed under pseudonym while also retaining public access to the courtroom at trial. *See, e.g.*, *Sante Fe Indep. Sch. Dist.*, 933 F. Supp. at 652 (ordering both that "The trial shall remain generally open to the public when the minor Plaintiffs are not testifying" and "Plaintiffs [including adult plaintiffs] shall be referred to exclusively through use of fictitious names throughout all proceedings").

In this case, the public will retain access to any court proceedings even if Plaintiffs are granted this motion. Moreover, the public's interest in knowing the pertinent facts of the lawsuit will not be impaired, as the facts relevant to this lawsuit all involve practices regularly taking place in Judge Mack's courtroom. Any member of the public has the right to visit Judge Mack's courtroom to witness the prayer practice for him or herself. And all pertinent facts have been, and will be, fully laid out in the documentation of this case, to which the public will retain their right of access.

Mr. Roe's personal identity adds nothing to the public discourse, while revealing his identity risks significant harm. On balance, all factors favor allowing Mr. Roe to proceed under pseudonym.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their Motion for Leave to Use Pseudonyms and For Protective Order be granted.

        Respectfully submitted,

        */s/ Sam Grover*
        Sam Grover
        Wisconsin State Bar No. 1096047
        Elizabeth Cavell (*motion for admission* pro hac vice *pending*)
        Wisconsin State Bar No. 1089353
        FREEDOM FROM RELIGION FOUNDATION, INC.
        P. O. Box 750
        Madison, Wisconsin 53701
        Telephone:  608-256-8900
        Telecopier:  608-204-0422
        Email:  sgrover@ffrf.org / ecavell@ffrf.org

        Ayesha Khan (*motion for admission* pro hac vice *pending*)
        D.C. Bar No. 426836
        Telephone: 301-246-0346
        Fax: (216) 927-2558
        Email: khan@clarionfirm.com