# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **FREEDOM FROM RELIGION** | § | |
| **FOUNDATION, INC. and JOHN ROE,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **CASE NO. 4:19-cv-1934** |
| | § | |
| **JUDGE WAYNE MACK in his personal** | § | |
| **capacity and in his official judicial capacity** | § | |
| **on behalf of the State of Texas,** | § | |
| | § | |
| *Defendants.* | § | |

## RESPONSE IN OPPOSITION TO DEFENDANT WAYNE MACK'S PERSONAL CAPACITY MOTION TO DISMISS

Plaintiffs submit the accompanying brief in opposition to Defendant Wayne Mack's Motion to Dismiss (Doc. No. 12), made in his individual capacity. This Response clarifies that this Court has subject matter jurisdiction because John Roe is suffering ongoing harm (including loss of business) due to his avoidance of Judge Mack's courtroom-prayer practice and FFRF has associational standing because John Roe is a member of FFRF. Plaintiffs then establish why Defendant's clergy-led courtroom-prayer practice—a practice adopted by *no other court in the country*—does not benefit from the same type of "unambiguous and unbroken history of more than 200 years" that the Supreme Court used to justify legislative prayer. Nor does it fit into the category of "ceremonial deism" that justifies the opening ceremonies in the U.S. Supreme Court and Texas Supreme Court. Ultimately, Plaintiffs ask this Court to deny Judge Mack's Motion to Dismiss and allow this case to proceed.

For the reasons stated in the below Response, Plaintiffs request that this Court deny Defendant Mack's Motion to Dismiss in its entirety.

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

STANDARD OF REVIEW .............................................................................. 3

ARGUMENT .................................................................................................. 5

    I.   Plaintiffs have standing to challenge the prayer practice. ........................... 6

        A.  Attorney Roe has established an injury in fact that is concrete and particularized................................................................................7

        B.  Attorney Roe is suffering actual, ongoing harm in order to avoid the substantial risk of being exposed to the courtroom-prayer practice. ................... 10

        C.  FFRF has established associational standing. ................................................. 13

    II.  Existing precedent counsels against dismissal, and indeed, reinforces that Judge Mack's courtroom-prayer practice is unconstitutional............................................... 15

        A.  Courtroom prayer is distinguishable from legislative prayer as a matter of law and under the facts of the complaint...................................................................... 16

        B.  Judge Mack's courtroom-prayer practice does not enjoy an unambiguous and unbroken history of more than 200 years......................................................... 19

        C.  Judge Mack's courtroom-prayer practice violates the Establishment Clause. 23

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ACLU of Georgia v. Rabun Cty. Chamber of Commerce, Inc.,*
698 F.3d 1098 (11th Cir. 1983)............................................................. 8, 9

*ACLU of Ohio Found., Inc. v. DeWeese,*
633 F.3d 424 (6th Cir. 2011)............................................................. 9

*Ala. Freethought Ass'n v. Moore,*
893 F.Supp. 1522 (N.D. Ala. 1995)............................................... 12, 22

*Am. Humanist Ass'n v. McCarty,*
851 F.3d 521 (5th Cir. 2017)............................................................. 23

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983)............................................................................. 13

*Clapper v. Amnesty Intern USA,*
133 S.Ct. 1138 (2013)............................................................. 10, 11, 12

*Club Retro, LLC v. Hilton,*
568 F.3d 181 (5th Cir. 2009)............................................................. 3

*Collins v. Morgan Stanley Dean Witter,*
224 F.3d 496 (5th Cir. 2000)............................................................. 4

*Conley v. Gibson,*
355 U.S. 41 (1957)............................................................................. 15

*Cty. of Allegheny v. ACLU,*
492 U.S. 573 (1989)............................................................. 20, 21–22

*Doe v. Beaumont Indep. Sch. Dist.,*
173 F.3d 274 (5th Cir. 1999)............................................................. 23

*Doe v. Beaumont Indep. Sch. Dist.,*
240 F.3d 462 (5th Cir. 2001)............................................. 6, 7, 8, 9

*Doe v. Sch. Bd. of Ouachita Par.,*
274 F.3d 289 (5th Cir. 2001)............................................................. 8

*Doe v. Tangipahoa Par. Sch. Bd.,*
494 F.3d 494 (5th Cir. 2007) (*en banc*)......................................... 8, 9

*Elk Grove Unified Sch. Dist. v. Newdow,*
542 U.S. 1 (2004)............................................................................. 3, 21

*Freedom From Religion Found. v. Mack*,
4:17-cv-881 (S.D. Tex. Sept. 27, 2018) .................................................. 1, 2, 4, 8, 11, 12, 14, 23

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*,
528 U.S. 167 (2000) .................................................................................................. 6, 10

*Glassroth v. Moore*,
335 F.3d 1282 (11th Cir. 2003) ............................................................................. 20

*Henok v. Kessler*,
78 F. Supp. 3d 452 (D.D.C. 2015) ......................................................................... 13

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ..................................................................................................... 15

*Hitt v. City of Pasadena*,
561 F.2d 606 (5th Cir. 1977) ..................................................................................... 3

*Hunt v. Wa. State Apple Advertising Comm'n*,
432 U.S. 333 (1977) .............................................................................................. 13–14

*Lee v. Weisman*,
505 U.S. 577 (1992) ........................................................................................ 17, 18–19

*Littlefield v. Forney Indep. Sch. Dist.*,
268 F.3d 275 (5th Cir. 2001) ..................................................................................... 8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................................... 6

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ................................................................................................... 21

*Marsh v. Chambers*,
463 U.S. 783 (1983) ......................................................................................... 2, 19–22

*McCartney v. First City Bank*,
970 F.2d 45 (5th Cir. 1992) ....................................................................................... 4

*McCollum v. Bd. of Educ.*,
333 U.S. 203 (1948) ................................................................................................... 18

*McCreary Cty. v. ACLU of Ky.*,
545 U.S. 844 (2005) ................................................................................................... 24

*McKinney v. U.S. Dep't of the Treasury*,
799 F.2d 1544 (Fed. Cir. 1986) .............................................................................. 13

*Medina v. Devine*,
No. 4:96-cv-02485 (S.D. Tex. Apr. 2, 1997) ........................................................................ 13

*Murray v. City of Austin*,
947 F.2d 147 (5th Cir. 1991) ................................................................................................ 8

*N.C. Civil Liberties Union Legal Found. v. Constangy*,
947 F.2d 1145 (4th Cir. 1991) ............................................................ 17–18, 20, 22, 23, 24

*Natural Arch & Bridge Soc'y v. Alston*,
209 F. Supp. 2d 1207 (D. Utah 2002) ................................................................................ 14

*Paton v. United Parcel Service, Inc.*,
910 F. Supp. 1250 (S.D. Tex. 1995) ..................................................................................... 4

*Ramming v. United States*,
281 F.3d 158 (5th Cir. 2001) ................................................................................................ 3

*Saladin v. City of Milledgeville*,
812 F.2d 687 (11th Cir. 1987) .............................................................................................. 8

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) ........................................................................................................... 10

*Society of Separationists, Inc. v. Herman*,
959 F.2d 1283 (5th Cir. 1992) ............................................................................................ 13

*Stokes v. Gann*,
498 F.3d 483 (5th Cir. 2007) ................................................................................................ 3

*Suhre v. Haywood Cty.*,
131 F.3d 1083 (4th Cir. 1997) .............................................................................................. 8

*Susan B. Anthony List v. Driehaus*,
134 S.Ct. 2334 (2014) ........................................................................................................ 10

*Town of Greece v. Galloway*,
134 S.Ct. 1811 (2014) ............................................................................ 2–3, 16–17, 19–20

*Valley Forge Christian College v. Americans United for Separation of Church and State,
Inc.*, 454 U.S. 464 (1982) ........................................................................................ 7–9, 10

*Vasquez v. Los Angeles ("LA") Cty.*,
487 F.3d 1246 (9th Cir. 2007) .............................................................................................. 8

*W. Va. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ............................................................................................................. 1

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................ 14

*Woodard v. Andrus*,
419 F.3d 348 (5th Cir. 2005) ............................................................................... 3–4

## RULES

FED. R. CIV. P. 12(b)(1) ............................................................................................ 3

Fed R. Civ. P. 12(b)(6) ............................................................................................. 3

FED. R. CIV. P. 12(d) .......................................................................................... 4, 19

## OTHER AUTHORITIES

Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119 (1965) . 22

## INTRODUCTION

Acting as a Justice of the Peace on behalf of the State of Texas, Judge Wayne Mack has instituted a novel courtroom prayer practice unlike anything adopted by any other court in the country. Rather than being content to follow in the footsteps of the Supreme Court and Texas Supreme Court, which open their sessions with the ceremonial recitation "God save the United States [State of Texas] and this Honorable Court," Judge Mack instead designed a practice meant to guarantee his court would open exclusively with prayers directed to the Christian God, by exclusively Christian chaplains. From the beginning, his stated goal has been to use his judicial office to advance his personal religious beliefs, in direct violation of the First Amendment of the U.S. Constitution, which counsels that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Through this practice Judge Mack has ostracized many Christian, minority religious, and nonreligious attorneys and litigants in his courtroom.[1] Plaintiff John Roe is one of those attorneys. He is suffering actual, ongoing financial harm through loss of business in order to avoid harm that is certain to occur each time he sets foot in Judge Mack's courtroom, as it has at least 20 times already. Plaintiffs now seek relief from this Court for deprivation of Attorney Roe's constitutional rights, and the rights of every other litigant who goes before Judge Mack.

---

[1] *See, e.g.*, Compl., Ex. D at 3, Ex. G (recounting the negative impressions of Judge Mack's courtroom prayer practice by two separate non-attorney litigants in Judge Mack's courtroom in Aug. 2014 and May 2016); *id.* Ex. E (describing an attorney's negative experience with the prayer practice on three occasions in 2014–2015); *id.* ¶¶ 8–9, 81–86 (describing harm suffered by Attorney John Roe due to Judge Mack's courtroom prayer practice); *Freedom From Religion Found. v. Mack*, 4:17-cv-881, Doc. No. 22 ¶¶ 9, 36–37 (S.D. Tex. 2018) (describing attorney "Jane Doe's" experiences and objections, as a Christian, to Judge Mack's courtroom prayer practice). At least two attorneys have elected to either limit or entirely avoid practicing in the Precinct 1 court due to the prayers. *See* Compl. ¶¶ 86–89; 4:17-cv-881, ECF No. 22 ¶ 9.

Defendant Mack urges the Court to turn a blind eye to the inherently coercive authority of a judge within the unique context of his courtroom and rule that Plaintiffs have failed to state a claim on which relief could be granted. In support of his motion, Judge Mack puts forth the exact same arguments this Court found unpersuasive when Montgomery County moved to dismiss a separate challenge to this same courtroom-prayer practice in 2017. *See Freedom From Religion Found. v. Mack*, 4:17-cv-881, Doc. No. 52 (S.D. Tex. Jan. 19, 2018) (attached as Resp. Ex. A). Although Judge Mack was not a party in Plaintiffs' previous lawsuit against Montgomery County, the County incorporated by reference arguments from a motion to dismiss filed by Judge Mack.[2] And while this Court's 2018 Order from that case is not binding precedent, because the exact same arguments now advanced in Defendant's brief were rejected by this Court, the 2018 Order is well-reasoned persuasive authority. It is telling that Judge Mack does not even attempt to address the legal reasoning and conclusions from that 2018 Order in his current motion.

First, rather than contending with the theories of standing found sufficient by this Court in its 2018 Order, Defendant ignores the ongoing harm being suffered by Attorney Roe through his reasonable actions taken to avoid Judge Mack's courtroom-prayer practice and instead focuses only on alternative theories of standing. Defendant next asks the Court to look beyond the four corners of Plaintiffs' pleadings and consider a few scattered examples of courtroom prayer that fall far short of the "unambiguous and unbroken history of more than 200 years" that justified legislative prayer in *Marsh v. Chambers*, 463 U.S. 783 (1983), and rule that as a matter of law, courtroom prayer "fits within" that legislative prayer exception, despite the express, contrary language in *Town of Greece v. Galloway*, 134

---

[2] *See* 4:17-cv-881, Doc. No. 29 at 11 (incorporating by reference "the arguments and authorities contained in Mack's Motion to Dismiss, Section I. (Doc. 24, ppg. 6 through 12, inclusive)"); *id.* Doc. No. 29 at 12 (incorporating by reference "the arguments and authorities contained in Mack's Motion to Dismiss, Section II. (Doc. 24, ppg. 12 through 20, inclusive)").

S.Ct. 1811 (2014). Defendant also conflates his clergy-led courtroom-prayer practice with the ceremonial opening calls of the U.S. Supreme Court and Texas Supreme Court, despite the Supreme Court's contrary characterization of its own practice as "ceremonial deism." *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 37 (2004) (O'Connor, J., concurring). None of those arguments is more persuasive now than when Montgomery County incorporated them from Judge Mack's brief in 2017 and Judge Mack's Motion to Dismiss should therefore be denied in its entirety.

## STANDARD OF REVIEW

Judge Mack's Motion to Dismiss raises arguments under FED. R. CIV. P. 12(b)(1) and 12(b)(6). "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam)). In considering Defendant's arguments as to lack of standing—arguments made under 12(b)(1)—the Court may consider "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 161. As the party asserting the Court's subject matter jurisdiction, Plaintiffs bear the burden of proof to establish standing. *Id.*

When considering Defendant's arguments that Plaintiffs have failed to state a claim on which relief can be granted—arguments made under 12(b)(6)—the Court must accept all well-pleaded facts as true and view those facts in the light most favorable to Plaintiffs. *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). The Court must also draw all reasonable inferences from well-pleaded facts in favor of Plaintiffs. *Club Retro, LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005) ("[T]he

complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff.").

In considering 12(b)(6) arguments, the Court "may not look beyond the four corners of the plaintiff's pleadings." *Paton v. United Parcel Service, Inc.*, 910 F. Supp. 1250 (S.D. Tex. 1995) (citing *McCartney v. First City Bank*, 970 F.2d 45, 47 (5th Cir. 1992)). In this case, Defendant has presented matters outside the pleadings, including the use of chaplains at some presidential inaugurations, references to other court practices that bear little resemblance to Judge Mack's courtroom-prayer practice,[3] and three examples of prayer before the empaneling of grand juries in the 1790s. *See* Doc. No. 12 at 15–21. None of Defendant's newly presented matters are proper for consideration at the motion to dismiss stage, *e.g.*, *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000), although in its 2018 Order this Court previously elected to take judicial notice "of the longstanding practice in many courts of opening court with a cry that mentions God." *See* Resp. Ex. A at 28 (noting "Such cries with their recited mention of "God" are in no realistic way comparable to the . . . prayers that Plaintiffs allege Judge Mack requires and oversees in his courtroom"). If this Court does not exclude the matters introduced by Defendant that fall outside the pleadings, then Defendant's motion "must be treated as one for summary judgment under Rule 56" and all parties must be given a reasonable opportunity to present additional material pertinent to those matters. FED. R. CIV. P. 12(d).

---

[3] Defendant Mack offers that the U.S Supreme Court and Texas Supreme Court have opening ceremonies that include a scripted reference to "God," that benches in the old Texas Supreme Court Building included a Latin phrase that purportedly references a higher power, that some witnesses and jurors take oaths that include the phrase "so help you God," a conversation between Chief Justice Jay and District Judge Richard Law describing practices in some New England state courts prior to the founding of the United States, and that at least a handful of judges have included references to "God" during sentencing or in written court opinions.

## ARGUMENT

The plain statements in Plaintiffs' Complaint (Document No. 1) establish that they are challenging the constitutionality of Judge Mack's courtroom-prayer practice under the Establishment Clause of the First Amendment. Compl. ¶ 2 ("Plaintiffs seek a declaration under 28 U.S.C. §2201 that Judge Mack . . . is conducting a courtroom-prayer practice in violation of the Establishment Clause of the First Amendment."). The Complaint is replete with specific allegations pertaining to the courtroom-prayer practice, including evidence of Judge Mack's original intention to have only Christians deliver prayers, *id*. ¶¶ 20–31, how the practice was originally executed, *id*. ¶¶ 32–41, 46–47, 52, Judge Mack's divisive religious rhetoric in defending his courtroom-prayer practice, *id*. ¶¶ 43, 45, 50–51, 59, and how Judge Mack has continued the practice largely unaltered, *id*. ¶¶ 61–80, despite ample notice that the prayers undermine his appearance of neutrality and impartiality as a judge. *E.g.*, *id*. ¶¶ 8–9, 81–86 (describing harm suffered by Attorney John Roe due to Judge Mack's courtroom prayer practice); Compl. Ex. D at 4–5 (FFRF's Sept. 2014 letter to Judge Mack, warning of the bias created by the courtroom-prayer practice); Compl. Ex. E (attorney's August 2015 letter to the State Commission on Judicial Conduct, writing "The Judge was so proud of his ceremonies that it would clearly be prejudicial to anyone who took exception"); Compl. Ex. G at 3 (a litigant's May 2016 description to the SCJC of being "appalled and worried because me and the judge made eye contact during the prayer…"). The complaint also describes the harms suffered by Attorney John Roe specifically, due to his exposure to Judge Mack's courtroom-prayer practice: "Although government-organized prayer violates Mr. Roe's sincerely held beliefs, he has felt compelled to remain in the courtroom during the prayers during each of his [more than 20] courtroom appearances out of concern that leaving would bias Judge Mack against him and his clients," *id*. ¶¶ 8–9, and that he "regularly worked within Montgomery County since before Wayne Mack became a judge,"

*id*. ¶ 8, but now "has elected to no longer represent clients before Judge Mack" and "has had to decline business in order to avoid appearing in Judge Mack's courtroom. *Id*. ¶¶ 86–87; *see also id*. ¶¶ 81–89.

As with his previous motion to dismiss, Judge Mack largely ignores the pleadings and the narrow constitutional challenge brought by Plaintiffs and instead mischaracterizes this lawsuit as a challenge to a series of unrelated practices including the Supreme Court and Texas Supreme Court's opening ceremonies, and the town council prayer practice held constitutional in a 2014 Supreme Court decision. *See* Judge Mack's Motion to Dismiss at 2 (asserting that "Plaintiffs . . . ask this Court to declare these deep-seated traditions unconstitutional."). But Judge Mack's courtroom-prayer practice is underserving of the protections afforded to longstanding historical practices. There is no such longstanding tradition of courtroom prayer in this country and the Supreme Court has made clear that its decisions do not support the conclusion that courtroom prayer is legal. Judge Mack's courtroom-prayer practice is unprecedented, and unconstitutional.

## I.   Plaintiffs have standing to challenge the prayer practice.

To establish Article III standing, a plaintiff must demonstrate that she "(1) has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "By insisting that a plaintiff have a personal stake—an individuated interest rather than an interest in good government shared by all citizens—Article III avoids enlisting federal courts in policy exercises about how the government operates." *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462 (5th Cir. 2001) (discussing standing issue in

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982)).

Judge Mack challenges Attorney Roe's standing by advancing the same two arguments rejected by this Court in FFRF's prior lawsuit against Montgomery County: he argues that Attorney Roe has not established an injury in fact that is "concrete and particularized" and that he has not established the likelihood of future harm, such that prospective relief would be improper. Judge Mack additionally challenges FFRF's associational standing, as he did previously. While this Court's prior rejection of these arguments does not create binding precedent, it is telling that Defendant does not attempt to contend with the Court's well-reasoned prior decision when advancing these same arguments in the present case. Each argument is addressed below.[4]

### A. Attorney Roe has established an injury in fact that is concrete and particularized.

Defendant relies on *Valley Forge* to argue that Plaintiffs have not established an injury in fact that is concrete and particularized. 454 U.S. 464 (1982) (ruling on a challenge to a government land transfer to a religious institution). This reliance is misplaced. Although the *Valley Forge* plaintiffs were dedicated to the separation of church and state, they did not reside in the state where the challenged conveyance was made (Pennsylvania) and only learned about the conveyance through a news release. *Id.* at 487. In interpreting and applying the holding in *Valley Forge*, circuit courts, including the Fifth Circuit, have recognized that the Court's holding relied principally on the distance of the plaintiffs from the community in which the challenged conduct took place. *See, e.g., Beaumont Indep. Sch. Dist.*, 240 F.3d at 466 ("[The *Valley Forge* plaintiffs] had *no* relationship to the government

---

[4] Defendant does not challenge Plaintiffs' standing on the grounds that their injuries are not fairly traceable to the challenged courtroom prayer practice. Nor does Defendant argue that the injuries could not be redressed by a favorable decision.

action at issue other than an interest in seeing the law enforced. They had suffered no injury from any unconstitutional acts not suffered by all citizens."); *Vasquez v. Los Angeles ("LA") Cty.*, 487 F.3d 1246, 1252 (9th Cir. 2007) (distinguishing *Valley Forge* because the plaintiffs "were physically removed from the defendant's conduct"); *Suhre v. Haywood Cty.*, 131 F.3d 1083, 1086 (4th Cir. 1997) (describing the complaint in *Valley Forge* as "a mere abstract objection" and noting that *Valley Forge* recognized standing where there is "direct contact with an unwelcome religious exercise"); *Saladin v. City of Milledgeville*, 812 F.2d 687, 692-93 (11th Cir. 1987) (referencing *ACLU of Georgia v. Rabun Cty. Chamber of Commerce, Inc.*, 698 F.3d 1098 (11th Cir. 1983), which distinguished the facts in that case from *Valley Forge*).

This Court's 2018 Order persuasively confirms the inapplicability of *Valley Forge* to the present case. *See* Resp. Ex. A at 12–15 ("After *Valley Forge*, the Fifth Circuit has twice en banc considered standing in Establishment Clause challenges and both times rejected [a] broad reading of the Supreme Court's language.") (discussing *Beaumont Indep. Sch. Dist.*, 240 F.3d 462 (*en banc*) and *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494 (5th Cir. 2007) (*en banc*)). This Court concluded, "Thus, under *BISD* and *Tangipahoa Parish*, personal exposure to an alleged Establishment Clause violation that impairs a plaintiff's enjoyment or use of a public facility is sufficient to confer standing to challenge the violation." Resp. Ex. A at 14 (citing *Beaumont Indep. Sch. Dist.*, 240 F.3d at 466; *Doe v. Sch. Bd. of Ouachita Par.*, 274 F.3d 289, 292 (5th Cir. 2001); *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 294 n.31 (5th Cir. 2001); *Murray v. City of Austin*, 947 F.2d 147, 151–52 (5th Cir. 1991)). Judge Mack does not mention any of these cases, let alone attempt to distinguish the present case from this line of precedent.

*Valley Forge* reaffirmed rather than repudiated the idea that non-economic injury can provide a sufficient injury-in-fact to confer Article III standing. *Rabun*, 698 F.2d at

1105–06. Subsequent to *Valley Forge*, courts have nearly uniformly recognized that an Establishment Clause plaintiff need only demonstrate "direct, unwelcome contact" with a challenged practice in order to have standing. *See, e.g.*, *Vasquez*, 487 F.3d at 1253 (surveying such cases in the 2nd, 5th, 10th, and 11th Circuits); *Suhre*, 131 F.3d at 1086–90 (4th Cir. 1997); *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 429–30 (6th Cir. 2011). While the foregoing cited cases primarily concern permanent religious displays rather than permanent prayer practices, the Fifth Circuit decision in *Tangipahoa Parish* extended the same reasoning to a government prayer practice. *See* 494 F.3d 494.

In *Tangipahoa Parish*, the plaintiff Doe family challenged regular Christian prayer at school board meetings despite "no evidentiary proof that any of the Does ever attended a school board session at which a prayer like those challenged here was recited." *Id.* at 498. In considering whether plaintiffs had standing, the Fifth Circuit stated, "The question is whether there is proof in the record that Doe or his sons were exposed to, and may thus claim to have been injured by, invocations given at any Tangipahoa Parish School Board meeting." *Id.* at 497. The court concluded that plaintiffs lacked standing because there was no such evidence of direct exposure. *Id.* at 499. Conversely, when the Fifth Circuit was presented with plaintiffs who attended a school with a religious program, the court found no issue with standing, concluding, "At bottom, the claim is that the program unconstitutionally prefers religion over non-religion, that the students cannot participate in the school's offered program without taking part in an unconstitutional practice. If found at trial, this [amounts to] . . . a concrete, judicially cognizable injury." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 467.

In the instant case, Attorney Roe has suffered injuries analogous to the students in *Beaumont ISD*: he cannot participate in Precinct 1 courtroom proceedings without taking part in an unconstitutional practice. He has demonstrated a personal stake in the outcome

of litigation through his direct exposure to the challenged practice and the coercion to participate he experienced. *See* Compl. ¶¶ 8–9, 81–89. Furthermore, Attorney Roe has suffered financial harm due to the courtroom-prayer practice. He "has had to decline business in order to avoid appearing in Judge Mack's courtroom," Compl. ¶ 87, and "[i]f Judge Mack's courtroom-prayer practice were discontinued, Attorney Roe would resume practicing within the Precinct 1 court." Compl. ¶ 89. All of these allegations meet Article III's requirement that harm suffered be concrete and particularized.

### B. Attorney Roe is suffering actual, ongoing harm in order to avoid the substantial risk of being exposed to the courtroom-prayer practice.

Prospective relief is available to a plaintiff who is suffering ongoing harm due to behavior undertaken to avoid a substantial risk of injury. *See, e.g.*, *Friends of the Earth, Inc.*, 528 U.S. at 184–85 (finding standing to pursue injunctive relief based on statements that plaintiff's members changed their behavior to avoid pollution dumped into a river by defendant). The Supreme Court has long recognized altered conduct as an injury-in-fact. *See, e.g.*, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 (1963); *Valley Forge Christian College*, 454 U.S. at 486 n.22 ("The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause . . . but because impressionable school children were subjected to unwelcome religious exercise *or were forced to assume special burdens to avoid them*") (emphasis added). In order to sustain such a claim, the harm being avoided still must be *either* "'certainly impending,' *or* there is a 'substantial risk' that the harm will occur." *See Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Intern USA*, 133 S.Ct. 1138, 1150 n.5 (2013) ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.")) (emphasis added). Attorney Roe meets this standard; he

has assumed an ongoing special burden—avoiding the Precinct 1 courtroom—in order to avoid a constitutional violation perpetrated by Defendant.

Judge Mack chooses not to address standing based on avoidance, despite this Court finding that a different attorney had standing under this theory in its 2018 Order. In rejecting this same "lack of standing" argument, this Court noted that Attorney *Doe* "has appeared before Judge Mack at least three times; . . . was exposed to the clergy-led prayer each time; . . . now actively avoids taking on new clients with cases that will be heard by Judge Mack; . . . has turned down three potential clients for this reason, causing her financial loss . . . ." Resp. Ex. A at 17. The Court concluded, "Because there is a 'substantial risk' that Doe will be exposed to Judge Mack's prayer practice if she does not continue to turn down clients with cases before him, Doe's injury is not self-inflicted and she has standing to seek prospective relief." *Id.* at 18 (citing *Clapper*, 133 S.Ct. at 1150 n.5). In the present case, Attorney Roe has standing under the exact same theory.

Like Attorney Doe, Attorney Roe has altered his conduct—by electing to no longer practice in the Precinct 1 court—solely in order to avoid Judge Mack's courtroom-prayer practice. He "regularly worked in Montgomery County since before Wayne Mack became a judge" and after Judge Mack took office he "appeared in Judge Mack's courtroom at least 20 times to represent different clients in at least 45 matters." Compl. ¶ 8. He then "decided that he no longer wished to compromise his sincerely held beliefs by continuing to participate in Judge Mack's courtroom-prayer practice. But because Roe does not wish to jeopardize any client's case by appearing before Judge Mack without having participated in the prayer, Attorney Roe has elected to no longer represent clients before Judge Mack" and "has had to decline business in order to avoid appearing in Judge Mack's courtroom." Compl. ¶¶ 86–87. Finally, "If Judge Mack's courtroom-prayer practice were discontinued,

Attorney Roe would resume practicing within the Precinct 1 court." *Id.* ¶ 89. These facts are more than sufficient to establish standing under the theory of avoidance.

While Judge Mack does not address Attorney Roe's avoidance, Mack does argue lack of imminence, since Roe "has successfully avoided Judge Mack's courtroom for two years." Judge Mack's MTD (Doc. 12) at 13. But lack of recent exposure does not defeat standing when a practice is ongoing. That merely demonstrates that Attorney Roe is successfully avoiding the unconstitutional conduct (and suffering harm as a result). To establish imminence, Attorney Roe must demonstrate that prior to changing his conduct to avoid Judge Mack's courtroom, his "regular course of business . . . repeatedly subjected [him] to the allegedly unconstitutional conduct." *Ala. Freethought Ass'n v. Moore*, 893 F.Supp. 1522 (N.D. Ala. 1995) (providing thorough analysis on applicable standing doctrine and finding no standing to challenge a judge's clergy-led courtroom prayer practice for plaintiffs without regular contact with the courtroom). The risk of exposure also must not be attenuated, as this Court noted in 2018. *See* Resp. Ex. A at 18 (contrasting the "highly attenuated" theory of standing in *Clapper* to plaintiffs' standing, concluding "there is no similar attenuation" with Attorney Doe's theory of standing based on avoidance). Plaintiffs have established a substantial risk of exposure, as Attorney Roe has experienced Judge Mack's courtroom-prayer practice "[d]uring each . . . appearance" in Judge Mack's courtroom, of which there have been more than 20. Compl. ¶ 8. Exposure to the courtroom-prayer practice is inevitable for those practicing in Judge Mack's court, since Judge Mack conducts his prayer practice at the start of every court session. *See* Compl. ¶ 92 (Judge Mack's goal and objective in implementing his courtroom-prayer practice was to mark the start of *each* Precinct 1 Court session with Christian prayer) (emphasis added); *id.* ¶ 65 ("The revised practice . . . may vary slightly day-to-day, but has remained largely consistent ever since."). Thus, the risk is not attenuated. Nothing more is needed to establish standing.

Judge Mack draws a false equivalence between Attorney Roe—who regularly declines business within the Precinct 1 Court's jurisdiction—and ordinary citizens, who cannot establish a reasonable expectation that they will wind up in court again. Defendant cites three cases involving non-attorney challenges to courtroom practices: *Society of Separationists, Inc. v. Herman*, 959 F.2d 1283 (5th Cir. 1992) (denying prospective relief to a citizen who was summoned for jury duty); *Henok v. Kessler*, 78 F. Supp. 3d 452, 464 (D.D.C. 2015) (denying prospective relief to a plaintiff whose divorce was heard before a judge who was "no longer assigned to [plaintiff's] case"); and *Medina v. Devine*, No. 4:96-cv-02485 (Dkt. 44) (S.D. Tex. Apr. 2, 1997), which he represents is a case where the district court dismissed a claim for prospective relief because a non-attorney plaintiff's case "was 'no longer pending' " before the judge. Judge Mack also cites *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (denying injunctive relief because the fact that plaintiff "may have been illegally choked by the police on October 6, 1976 . . . does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him"). None of this authority undercuts the reasonable inference that an attorney who regularly avoids taking cases that fall under Judge Mack's jurisdiction would be exposed to Judge Mack's courtroom prayers if the attorney stopped declining those cases.

### C.  FFRF has established associational standing.

A party to a lawsuit acquires associational standing by showing that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claims asserted nor the relief requested requires the participation of the individual members in the lawsuit." *McKinney v. U.S. Dep't of the Treasury*, 799 F.2d 1544, 1550 n.13 (Fed. Cir. 1986) (quoting *Hunt v. Wa. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Defendant

argues that FFRF lacks associational standing because its members do not have standing to sue in their own right. But Attorney Roe is a member of FFRF, *see* Compl. ¶ 7, and, as addressed above, he has standing. FFRF meets the second and third requirements for associational standing: the interest in maintaining courts that are not hostile to non-Christian litigants is germane to FFRF's purpose and neither the claims asserted, nor the relief requested, requires Attorney Roe's participation. *See Hunt*, 432 U.S. at 343 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.").

Judge Mack alternatively argues that even if Attorney Roe has standing, FFRF does not, because the complaint fails to allege that Roe "joined FFRF before he first observed" Judge Mack's courtroom prayers. Judge Mack's MTD at 14 n.6 (citing *Natural Arch & Bridge Soc'y v. Alston*, 209 F. Supp. 2d 1207, 1219 (D. Utah 2002)). But this is not the law in the Fifth Circuit, which this Court noted previously when it characterized *Alston* as "a single out-of-circuit district court opinion." Resp. Ex. A at 20. Judge Mack has not attempted to bolster his argument this time around. But even if he had, the argument makes no sense, since the harm to Attorney Roe is ongoing, meaning that Roe has certainly been harmed since becoming a member of FFRF. In rejecting this argument previously, this Court noted, "Unlike the individual plaintiff in *Alston*, Plaintiffs Roe and Doe allege that they were injured after becoming members of FFRF," since "Doe continues to decline accepting as clients those whose cases would require her to appear before Judge Mack." *Id.* at 20 n.44. Because FFRF has alleged "that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action," *Hunt*, 432 U.S. at 342–43 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)), FFRF has met its burden to establish associational standing.

## II.   Existing precedent counsels against dismissal, and indeed, reinforces that Judge Mack's courtroom-prayer practice is unconstitutional.

"At this stage of the litigation, [the court] must accept petitioner's allegations as true. A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). To justify dismissal at this stage of litigation, Defendant would have to cite to binding precedent that precludes judgment in Plaintiffs' favor. Defendant doesn't come close to meeting this burden. No such precedent exists. Defendant proposes two arguments that implicate dismissal: first, that courtroom prayer is indistinguishable from legislative prayer and thus should benefit from the "unambiguous and unbroken history of more than 200 years" of legislative prayer recognized by the Supreme Court, and second, that there is a similar history of courtroom prayer that justifies use of the same legal analysis that applies to legislative prayer.[5] Neither argument is convincing. The Supreme Court has suggested that a courtroom-prayer practice should be evaluated on its own merits, separate and distinct from legislative-prayer jurisprudence, and the only federal court of appeals to have considered a courtroom-prayer practice counseled against conflating it with legislative prayer, given the significant differences in both setting and audience. Defendant's second argument relies on an incredibly sparse historical record—evidence which falls outside the pleadings—a record that, if anything, reveals the truth of the matter: courtroom prayer has never been a consistent or widespread practice in this country.

---

[5] Defendant also claims that the courtroom-prayer practice is not coercive, which is not true, and in any event, is but one of several Establishment Clause principles that the practice violates. *See* Sec. II.C., *infra*. Additionally, Defendant argues that chaplains are selected to participate in a non-discriminatory manner, which, even if true, would not render the practice constitutional.

**A. Courtroom prayer is distinguishable from legislative prayer as a matter of law and under the facts of the complaint.**

Judge Mack first argues that his courtroom-prayer practice "fits within" the legislative prayer tradition established in *Marsh v. Chambers* and *Town of Greece v. Galloway* and should thus benefit from the same treatment. *See* Judge Mack's MTD at 15 (citing *Town of Greece*, 572 U.S. 565, 577 (2014)). But the Justices in *Town of Greece* explicitly disclaimed the idea that the decision applies to courtroom prayer. Justice Kagan was worried that some might interpret the decision that way. In her dissenting opinion, she wrote a highly detailed hypothetical, the specifics of which closely mirror Judge Mack's courtroom-prayer practice:

> You are a party in a case going to trial; let's say you have filed suit against the government for violating one of your legal rights. The judge bangs his gavel to call the court to order, asks a minister to come to the front of the room, and instructs the 10 or so individuals present to rise for an opening prayer. The clergyman faces those in attendance and says: "Lord, God of all creation, . . . We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength . . . from his resurrection at Easter. Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life. Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side . . . . Amen." The judge then asks your lawyer to begin the trial.

134 S.Ct. at 1842 (Kagan, J., dissenting). Justice Alito, concurring in *Town of Greece*, joined by Justice Scalia, specifically addressed the above hypothetical: "the principal dissent conjures up the image of a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer . . . I am concerned that at least some readers will take these hypotheticals as a warning that this is where today's decision leads—to a country in which religious minorities are denied the equal benefits of citizenship." *Id.* at 1834 (Alito, J., concurring). He continued, "Nothing could be further from the truth." *Id.* Far from standing for the idea that courtroom prayer should be lumped together with legislative prayer, *Town of Greece* stands for the exact opposite: the four Justices writing in dissent, plus Justice Alito and the late Justice Scalia, "would hold that the government officials responsible for

[the hypothetical courtroom-prayer practice] . . . crossed a constitutional line. I have every confidence the Court would agree." *Id.* at 1842 (Kagan, J., dissenting) (citing Justice Alito's concurrence at 1834). The remaining three Justices did not suggest otherwise. Thus, courtroom-prayer practices do not get a free ride to constitutionality on the back of a legislative-prayer tradition.

To determine if a practice is afforded the legislative-prayer exception, "[t]he inquiry remains a fact-sensitive one that considers both the **setting** in which the prayer arises and the **audience** to whom it is directed." *Town of Greece*, 134 S.Ct. at 1825 (emphasis added). If a public school teacher opened every school day with prayers delivered by guest chaplains in the exact manner described in *Town of Greece*, there is no doubt that the practice would violate the Establishment Clause. *Cf. Lee v. Weisman*, 505 U.S. 577 (1992) (holding similar prayers at graduation ceremonies unconstitutional). The practice would not receive the protections afforded to legislative prayer because even though the method of delivery is the same, the setting—the public school system—and the audience—school children readily susceptible to coercive pressure—makes the practice factually distinct from the unbroken 200-year tradition of legislative prayer. Judge Mack's courtroom-prayer practice is similarly distinguishable in setting and audience.

*Town of Greece* explicitly considered prayers in a legislative—as distinct from an adjudicatory—setting. *See* 134 S.Ct. at 1829 (Alito, J., concurring) ("I do not understand this case to involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding. The prayer preceded only the portion of the town board meeting that I view as essentially legislative."). The only federal court of appeals to have considered the constitutionality of courtroom prayer, noted, "A judge opening court with prayer presents an issue that is markedly different from a chaplain opening legislative sessions with prayer." *N.C. Civil Liberties Union Legal Found. v. Constangy*, 947 F.2d 1145,

1149 (4th Cir. 1991). Because "a judge presiding over a court is the court," the courtroom setting "entangles governmental and religious functions to a much greater degree than a chaplain praying before the legislature." *Id.* Perhaps the starkest difference identified by the Fourth Circuit is the purpose of an adjudicatory body. While "[a] legislature is by its very nature partisan and political," such that "a legislator has the role of advocate," "[b]ecause a judge must be a neutral decisionmaker, prayer in court by a judge has far more potential for establishing religion than legislative prayer." *Id.* Judge Mack's courtroom specifically is a far more coercive setting than a state legislature or local town council meeting. *See* Compl. ¶¶ 73–74 (noting the magnetically locked doors); *id.* ¶¶ 41, 52 (noting that Judge Mack scans the courtroom, "looking at each individual" during the prayers).

The audience for prayers is similarly different in an adjudicatory setting. "In contrast to legislative prayer, a judge's prayer in the courtroom is not to fellow consenting judges but to the litigants and their attorneys." *Constangy*, 947 F.26 at 1149; *see also* Compl. ¶ 70 ("The prayers are directed to those in attendance in the courtroom and everyone present is asked to participate, or show obeisance, by bowing their heads."). The audience in Judge Mack's courtroom is no exception; they are vulnerable to coercion. Citizens are often compelled to appear before Judge Mack under threat of additional fines or the issuance of an arrest warrant for failure to appear. This is in stark contrast to the members of the public who may choose to attend a legislative session, but is in line with public school cases that have long recognized the coercive nature of truancy laws. *See, e.g.*, *McCollum v. Bd. of Educ.*, 333 U.S. 203, 204 (1948) (noting Illinois' compulsory education law and that "[p]arents who violate this law commit a misdemeanor punishable by fine"). The coercive nature of Judge Mack's courtroom-prayer practice is particularly potent when he holds juvenile court hearings. *E.g.*, *Lee*, 505 U.S. at 593–94 (noting the heightened level of coercive pressure the state can exert on adolescents, since "adolescents are often

susceptible to pressure from their peers towards conformity, and that [ ] influence is strongest in matters of social convention. . . the government may no more use social pressure to enforce orthodoxy than it may use more direct means"); Compl. ¶ 81 (noting Attorney Roe has observed the courtroom-prayer practice "when Judge Mack was hearing an entirely juvenile docket").

Based on the plain language in *Town of Greece* and the unique setting and audience involved with Judge Mack's courtroom-prayer practice, Defendant cannot establish that this practice "fits within" the legislative-prayer scheme.

### B. Judge Mack's courtroom-prayer practice does not enjoy an unambiguous and unbroken history of more than 200 years.

Judge Mack offers no cases that address the legality of clergy-led prayer in a courtroom setting or a prayer practice directed to an audience of civil litigants and accused misdemeanor offenders. *Cf. Town of Greece*, 134 S.Ct. at 1825 (ruling that the inquiry is "a fact-sensitive one" that considers both of these factors). Because Defendant has not—and cannot—point to precedent that dictates dismissal of Plaintiffs' complaint at this early stage of litigation, this Court may end its inquiry there and deny Defendant's motion. Judge Mack argues that this Court should nevertheless proceed to the merits, extend the historical approach used in *Marsh* and *Town of Greece* to the unique setting of his courtroom, and conclude that his courtroom-prayer practice enjoys a "longstanding history" based on evidence that falls outside of the pleadings. This Court should reject that invitation at this pre-discovery stage of litigation, since considering matters outside the pleadings would convert Defendant's motion into "one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). If the Court does accept Defendant's invitation to analyze the history of courtroom prayer, the Court should find that the few available examples are scattered, broken, ambiguous, and not analogous to the specific prayer practice at issue in

this case. Because there is no unambiguous and unbroken historical record of courtroom prayer that would justify treating Judge Mack's courtroom-prayer practice under the same approach used by the Supreme Court in *Marsh* and *Town of Greece*, the Defendant's Motion to Dismiss should be denied.

In *Constangy*, the Fourth Circuit Court of Appeals fully considered *Marsh*'s historical approach to analyzing legislative prayer and rejected it within the context of the courtroom, concluding, "[u]nlike legislative prayer, **there is no similar long-standing tradition of opening courts with prayer**. Nor is there any evidence regarding the intent of the Framers of the Bill of Rights with regard to the opening of court with prayer." *Constangy*, 947 F.2d at 1148 (emphasis added). The *Constangy* court then applied a traditional Establishment Clause analysis to the courtroom prayer at issue and concluded that the practice violated all three prongs of the *Lemon* test. *Id.* at 1149–53. When addressing Defendant's courtroom-prayer practice on the merits, this Court should do the same. Nothing in *Town of Greece* or any other post-*Constangy* decision calls into question the Fourth Circuit's logic on the inapplicability of the history approach to courtroom prayer.

"The Supreme Court has warned that a broad reading of *Marsh* 'would gut the core of the Establishment Clause' and has stated that '*Marsh* plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today.'" *Glassroth v. Moore*, 335 F.3d 1282, 1298 (11th Cir. 2003) (citing *Cty. of Allegheny v. ACLU*, 492 U.S. 573, 603–04 (1989)). Defendant offers alleged examples of judicial prayers at various points in history in an effort to establish that courtroom prayer enjoys an "unambiguous and unbroken history of more than 200 years." *Marsh*, 463 U.S. at 792. But the spotty examples offered by Defendant are not analogous to the history established in *Marsh*. Nor could they be. Courtroom prayer is exceedingly rare.

Defendant first points to the traditions of the Supreme Court and Supreme Court of Texas of opening sessions with the phrase "God save the United States [the State of Texas] and this Honorable Court" and argues that this justifies Defendant's chaplain-led courtroom-prayer practice. Judge Mack's MTD at 16. This argument misunderstands the nature of these traditions. The Supreme Court has explicitly recognized that its opening call is one of a handful of references "to the divine" that fall under the category of "ceremonial deism." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 37 (2004) (O'Connor, J., concurring) (citing as examples the Supreme Court's opening phrase, the national motto, "religious references in traditional patriotic songs such as The Star-Spangled Banner," and "the phrase 'under God' in the Pledge of Allegiance"). A religious reference may qualify as ceremonial deism due to its "history, character, and context."[6] *Id.* All practices deemed ceremonially deistic share a common *character* that clergy-led prayer does not: such references do not offend the Constitution under the theory that "they have lost through rote repetition any significant religious content." *Lynch v. Donnelly*, 465 U.S. 668, 716 (1984) (Brennan, J., dissenting). Unlike these ceremonially deistic practices, clergy-led prayer does not involve rote repetition. There is no script for the prayers invoked in Judge Mack's courtroom. For this reason, a clergy-led courtroom-prayer practice cannot be justified by reference to the Supreme Court and Texas Supreme Court's practices.

Defendant next points to three examples of prayers delivered between 1790 and 1800 as evidence that clergy-led (and, apparently, judge-led) courtroom prayer enjoys a sufficiently unambiguous and unbroken history of more than 200 years. This argument is also flawed. The Supreme Court has noted that *Marsh* does not stand for the proposition

---

[6] Although both appeal to history, legislative prayer was not justified in *Marsh* as ceremonial deism. *Marsh* established a separate, unique standard for legislative prayer based solely on the practice's "unambiguous and unbroken history of more than 200 years." The majority opinion did not analyze either the character of the prayers or the context in which they were said.

"that specific practices common in 1791 are an exception to the otherwise broad sweep of the Establishment Clause . . . ." *Cty. of Allegheny*, 492 U.S. at 670 (Stevens, J., concurring in part); *see also Marsh*, 463 U.S. at 789 ("Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees . . . ."). At this pre-discovery stage of litigation, Defendant relies on evidence that may be inadmissible under the Federal Rules of Civil Procedure and that is unsupported by any expert testimony that would aid this Court in determining the validity of what Defendant alleges are sufficiently analogous examples of courtroom prayer. This Court should reject Defendant's invitation to ratify this "law-office history" in lieu of an authenticated historical record.[7] Additionally, Defendant offers precious little evidence that the practice of courtroom prayer continued, unbroken, into the modern era. Judge Mack cites three examples from the turn of the twentieth century, but they only serve to emphasize how spotty and broken the practice truly is.

Defendant also could have referenced more modern examples—from the late 1980s and mid-1990s—of the brief clergy-led courtroom-prayer practice adopted by then-judge Roy Moore of the Etowah County Courthouse in Gadsden, Alabama or the judge-led prayer practice of the Honorable William Constangy of the Twenty Sixth Judicial District of Northern Carolina. But, of course, like Judge Mack's practice in this case, both those practices resulted in quick litigation. *See Ala. Freethought Ass'n*, 893 F.Supp. 1522; *Constangy*, 947 F.2d 1145. Most telling of all is the other evidence not cited by Defendant. He makes no attempt to argue an unambiguous and unbroken history of any length for prayer in the courtrooms of Montgomery County's Justice of the Peace precincts or any

---

[7] Historian Alfred H. Kelly coined the term "law-office history" in 1965 to describe history as written by legal advocates rather than dispassionate scholars—history that is manipulated and cherry-picked to achieve a legal end. *See* Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965) ("By 'law-office history, I mean the selection of data favorable to the position being advanced without regard to or concern for contradictory data or proper evaluation of the relevance of the data proffered.").

other modern courtroom. The courtroom-prayer practice at issue in this case begins and ends with Judge Wayne Mack.

### C. Judge Mack's courtroom-prayer practice violates the Establishment Clause.

 Because Judge Mack's courtroom-prayer practice does not enjoy an unambiguous and unbroken history that warrants analyzing its constitutionality under the historical approach used in *Marsh* and *Town of Greece*, the practice must instead be analyzed against the core Establishment Clause principles traditionally applied to government religious promotion. *See Constangy*, 947 F.2d at 1149 ("Having concluded that the decision in *Marsh v. Chambers* does not require a ruling that judicial prayer does not violate the Establishment Clause, we proceed to analyze this case under the principles of *Lemon v. Kurtzman*."); *id.* at 1151 (also discussing endorsement). Those principles include that government action: must not have a predominantly religious purpose or the effect of advancing religion, *see, e.g.*, *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 n.10 (5th Cir. 2017), and must not "appear[ ] to take a position on questions of religious belief, or make[ ] adherence to a religion relevant in any way to a person's standing in the political community." *Id.* n.11 ("The government creates this appearance when it conveys a message that religion is favored, preferred, or promoted over other beliefs."). This Court previously evaluated Judge Mack's courtroom-prayer practice under these Establishment Clause principles, *see* Resp. Ex. A. at 30–32, although additionally the government must not unconstitutionally coerce conformance with a religious practice, which occurs when "(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors." *McCarty*, 851 F.3d at 525 n. 12 (quoting *Doe v. Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 285 (5th Cir. 1999)). Plaintiffs have pled facts that would invalidate Judge Mack's courtroom-prayer practice under any of these principles.

First, the Supreme Court has indicated that scrutinizing the purpose behind government activity makes "practical sense, [ ] in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact . . . ." *McCreary Cty. v. ACLU of Ky.*, 545 U.S. 844, 862 (2005). In this case, the pleadings demonstrate that Judge Mack began his courtroom-prayer practice in order to promote Christianity within his courtroom. *See, e.g.*, Compl. ¶ 21 (noting Judge Mack originally only invited Christian pastors to meet to discuss his plans for a courtroom-prayer practice); *id.* ¶ 27 (quoting the original Justice Court Chaplaincy Handbook, which described Judge Mack's chaplaincy program as a "ministry" and stated, "The role of the JCC Chaplain is to be a representative of God bearing witness to His hope, forgiveness and redeeming power."); *id.* ¶ 31 (showing the original JCC badge design included a Christian cross).

Similarly, the effect of the courtroom-prayer practice has been to promote religion in general and Christianity in particular. This constitutes a religious effect and government endorsement of religion. *See Constancy*, 947 F.2d at 1151 ("When a judge sits on the bench, says 'Let us pause for a moment of prayer,' and proceeds to recite a prayer in court, clearly the court is conveying a message of endorsement of religion."). The complaint lays out this religious effect and endorsement. *See* Compl. ¶ 66–67 (describing the bailiff or court clerk's role in calling for the prayer and Judge Mack's role in the prayer practice: "While everyone remains standing, Judge Mack talks briefly about his Justice Court Chaplaincy Program and introduces a chaplain from the program."); *id.* ¶ 52 (describing Judge Mack standing before the assembled litigants during the prayer and scanning the courtroom).

Finally, the complaint establishes the many litigants and attorneys in Judge Mack's courtroom have been coerced into participating in Judge Mack's courtroom-prayer practice due to the unique power Judge Mack wields within the Precinct 1 Court. *E.g.*, Compl. ¶ 9 (alleging that Attorney Roe "has felt compelled to remain in the courtroom during the

prayers during each of his courtroom appearances out of concern that leaving would bias Judge Mack against him and his clients"); *id.* ¶ 41 (a litigant recalls, "Once the Bible reading was over we were then asked to bow our heads to pray. I was very uncomfortable and certainly felt that I was being coerced into following this ritual and that the outcome of my case depended upon my body language. . . ."); *id.* ¶ 47 (an attorney notes that Judge Mack "was so proud of his ceremonies that it would clearly be prejudicial to anyone who took exception. . . . My participation was cowardly and something I am ashamed of, but appearing for a client constrained me to cooperate."); *id.* ¶ 52 (a litigant recalls being appalled and worried after locking eyes with Judge Mack during a courtroom prayer). The courtroom-prayer practice thus fails the coercion test as well.

## CONCLUSION

Judge Mack has instituted a unique courtroom-prayer practice within the Precinct 1 Court—a practice not followed by any other court in the country. Attorney John Roe directly encountered this practice more than 20 times while appearing before Judge Mack. Because he is unable to avoid the courtroom-prayer practice without jeopardizing his clients' cases, but continuing to observe these prayers would violate his sincerely held beliefs, Attorney Roe has elected to stop taking cases in Judge Mack's court. Were he to resume taking cases before Judge Mack, he would certainly be exposed to the courtroom-prayer practice again, as the prayers take place at the start of each court session. Attorney Roe therefore has standing to seek prospective declaratory relief and this Court has jurisdiction to grant that relief. The Supreme Court has recognized that courtroom prayer is legally distinct from legislative prayer and Judge Mack's clergy-led courtroom-prayer practice is not justified by anything resembling the "unambiguous and unbroken history of more than 200 years" that justified legislative prayer in *Marsh*.

For the foregoing reasons, the Court should deny Judge Mack's Motion to Dismiss.

Dated:  September 25, 2019

Respectfully submitted,

*/s/ Sam Grover*
Sam Grover
Wisconsin State Bar No. 1096047
FREEDOM FROM RELIGION FOUNDATION, INC.
P. O. Box 750
Madison, WI 53701
Telephone:  608-256-8900
Telecopier:  608-204-0422
Email:  sgrover@ffrf.org

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Sam Grover, hereby certify that on this the 25th day of September, 2019, a true and correct copy of the foregoing document was transmitted using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Sam Grover*
Sam Grover