UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREEDOM FROM RELIGION FOUNDATION, INC. and JOHN ROE, | § § § § § § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-1934 |
| | § § | |
| WAYNE MACK, in his personal capacity and in his official capacity on behalf of the State of Texas, | § § § § § | |
| Defendant. | | |

**MEMORANDUM OPINION AND ORDER**

**I.    INTRODUCTION**

Before the Court are competing motions for summary judgment and responses, reflected in the plaintiffs', Freedom From Religion Foundation, Inc. ("FFRF") and John Roe ("Roe"), motion for summary judgment [Dkt. 61], the defendant's, Wayne Mack, motion for summary judgment [Dkt. 59], the parties' respective responses [Dkt.'s 64 and 65], and their respective replies [Dkt.'s 69 and 71]. In addition, the defendant has filed a statement of undisputed facts [Dkt. 60], to which the plaintiffs filed a response [Dkt. 67]. The plaintiffs also filed a statement of undisputed facts [Dkt. 61-3], to which the defendant filed a response [Dkt. 64].

After having carefully considered the parties' submissions, the record, and the applicable law, the Court determines that the plaintiffs' motion for summary judgment should be **GRANTED**, and the defendant's motion for summary judgment should be **DENIED**.

**II.    BACKGROUND**

The plaintiff, Roe, is an attorney who operates a law practice, primarily involving landlord-tenant disputes, in Montgomery County, Texas. The plaintiff, FFRF, is a non-profit

membership organization, of which Roe is presently a member.[1] The plaintiffs have sued the defendant, Wayne Mack, a Justice of the Peace in Precinct 1 of Montgomery County, Texas, both individually and in his official judicial capacities. He has served in that position since May 1, 2014, and presides in two courtrooms, one in Willis, Texas and another in Montgomery, Texas. Until June 2017, Roe appeared regularly in the defendant's courtroom in the course of his practice.

The defendant's duties as Justice of the Peace also involve acting as the county coroner. In June 2014, the defendant created a "Chaplaincy Program" (the Program) to, as he describes it, "assist the Court system and Law Enforcement with grieving families on tragic death scenes or death call notifications." He also developed a Justice Court Chaplaincy Handbook (the Handbook) to explain the mission of the Program and the responsibilities of its participants. He describes the Program's purpose as threefold: (a) "to provide care and counseling to first responders and their families; (b) to comfort and provide resources to victims; and, (c) to assist law enforcement in notifying next of kin and providing comfort to grieving families." The defendant handed out a copy of the Handbook at a training session that he hosted for Program participants in September 2014. At that time, and through September 2015, the Handbook's first page included the image of a badge with a cross on it, appearing as follows:

---

[1] Plaintiff Roe has been a member of FFRF from June 5, 2017 to November 4, 2018 and from March 20, 2019 to the present.



These earlier versions of the Handbook also stated that "[t]he role of the JCC Chaplain is to be a representative of God[,] bearing witness to His hope, forgiving and redeeming power." The Handbook version in use as of August 7, 2018, includes no such image and states that "[t]he role of the JCC Chaplain is to be a representative of hope, forgiveness, and compassion."

In the beginning, to become a volunteer chaplain in the Program, an individual was required to complete at least one training session held by the defendant. However, after 2014, the Program "grew and sustained [itself] naturally without any further work to spread the word." The defendant's staff kept and continually updated a list of volunteer chaplains. According to the Program List, from November 2017 to October 2020, between 75 and 100 participants volunteered for the Program. During this period, approximately 90 percent of the volunteer chaplains represented surrounding Protestant Christian congregations, but the List also included one representative each from the Catholic, Buddhist, Hindu, Mormon, and Jewish faiths, as well as at least two Muslim representatives.

From the Program's inception, the defendant invited volunteer chaplains to participate in a ceremony that opened his courts' proceedings. A court employee would send an email to all the chaplains, advising them of available court session dates. In the defendant's telling, his purpose was to "acknowledge these people of the faith community that [were] giving their time, talent,

resources to be on call to go to these tragic scenes." During the court ceremony, the chaplains typically delivered a prayer of their choosing. In later testimony, the defendant added that the ceremony's purpose was to "solemnize the proceedings in his courtroom" and "set[] [the] tone . . . [f]or everybody that's in the courtroom" by "speaking to the fact that this is a court of law" and the "rule of law will be applied and respected." He also testified that "a moment of silence or prayer often helps people center themselves emotionally in what can be an emotionally charged atmosphere." In subsequent proceedings, responding to a complaint before the Texas State Commission on Judicial Conduct, the defendant described an annual "Prayer Breakfast" that he organized as relating to "a campaign promise made and fulfilled, to open my court with prayer." In a 2015 letter to his supporters, the defendant defended his opening ceremony, stating his view that "the [Chaplaincy] program that I wanted in place was a program that God wanted in place, for His larger purpose."

Until approximately the end of 2014, the defendant initiated court proceedings by describing the Program, introducing the volunteer chaplain, and then inviting all present to stand for an invocation, or prayer, by the chaplain. The defendant announced that attendees could leave if they preferred not to be present during the opening ceremony, and that their case would not be affected. After the prayer, those who remained would recite the United States and Texas Pledges of Allegiance. The defendant would then take his seat, and after those who had absented themselves returned, the clerk would call the first case.

In September 2014, FFRF wrote to the defendant, objecting to his opening ceremony on the grounds that it violated the Establishment Clause of the federal Constitution. The defendant then changed certain aspects of the ceremony. Starting in approximately January 2015, he had installed signs outside his courtroom and a television screen at the back of the courtroom, both of which display the following text:

> It is the tradition of this court to have a brief opening ceremony that includes a brief invocation by one of our volunteer chaplains and pledges to the United States and Texas state flag.
>
> You are not required to be present or participate. The bailiff will notify the lobby when the court is in session.

According to the defendant and another courtroom employee, the bailiff now announces the above instructions prior to the defendant's entry into the courtroom, at which point attendees can exit the courtroom if they wish. However, the plaintiffs cite the declaration of Steve Smith, a former litigant in the defendant's court, stating that, during his hearing in January 2020, "[t]here was no opportunity to leave between the time that Judge Mack entered the courtroom and when the chaplain began praying[.]" The courtroom doors remain open on days when multiple bailiffs are present, but closed when only one bailiff is present. When the doors are closed, attendees can open the doors from within by pressing a button located in the courtroom.

Currently, as the defendant enters the courtroom, the bailiff instructs all attendees to rise. While everyone remains standing, the defendant briefly describes the Program, introduces the attending chaplain, and thanks the chaplain for their service to the Program. The attendees remain standing until the volunteer chaplain completes the prayer, at which point the defendant instructs them to be seated. Whether the defendant faces the attendees during the prayer is also disputed.² But the defendant testified that, once court is in session, he can observe whether a person enters the courtroom. In both of the defendant's courtrooms, if the doors are closed and court proceedings have begun, a bailiff must open the doors for anyone entering or re-entering the courtroom.

---

² The defendant contends that, in the revised ceremony, he always turns his back to the chaplains and faces the wall behind his bench, where the United States and Texas flags are located. However, Roe testified in his deposition that he has witnessed the defendant observing the audience during the opening ceremony. In his declaration, former litigant Steve Smith also states that, in January 2020, he witnessed the defendant surveying attendees during the opening ceremony.

According to deposition testimony from the defendant's clerk, an attending chaplain almost always delivers a prayer of some kind. During the ten times that Roe appeared in the defendant's courtroom, between August 2015 and July 2017, a Christian chaplain delivered a Christian prayer. The record does not contain evidence that, during any opening ceremony, any volunteer chaplain ever expressly encouraged conversion to his or her faith. Roe also "has no firsthand knowledge of any specific action taken by [the defendant] in response to anyone's participation" in the opening ceremony but "has reason to believe that he would risk bias if he were to absent himself from the courtroom" during the opening ceremony.[3] Regarding his hearing, in January 2020, declarant Smith states that there was "no question" in his mind that the defendant's observation of him during the ceremony "influenced [the defendant's] demeanor while hearing" his case and that the defendant "acted unprofessional and hostile" toward him.

Feeling that he could not refuse to participate in the opening ceremony without prejudicing his clients, in July 2017, Roe ceased representing clients with cases assigned to the defendant. He contends that he has, consequently, suffered pecuniary injury in the form of lost opportunities to represent clients in the defendant's court. In October 2014, FFRF filed a complaint against the defendant with the Texas State Commission on Judicial Conduct. In November 2015, the Commission declined to discipline the defendant. Additionally, on August 15, 2016, the Texas Attorney General issued an Opinion indicating that the prayer ceremony did not, in his view, violate the Establishment Clause.

On May 29, 2019, the plaintiffs filed suit against the defendant, in both his individual capacity and his "official judicial capacity on behalf of the State of Texas," alleging that the defendant's practice of opening each session of court with a courtroom prayer violates the

---

[3] Roe also recalls one occasion, on June 14, 2017, in which the court clerk "summoned" him and another pro se litigant into the courtroom from the jury room, specifically to observe the opening prayer being given by a chaplain. However, the record does not suggest that this was the regular practice of the court clerk.

Establishment Clause of the federal Constitution. Another court in this district previously dismissed a similar case against the defendant, in his capacity as a county official, because, in its judgment, Montgomery County lacked the power to control the activities in the defendant's courtroom. *See Freedom from Religion Found., Inc., v. Mack*, No. H-17-881, 2018 WL 6981153, at *3, *5 (S.D. Tex. Sept. 27, 2018). The Court has dismissed the State of Texas from this litigation. [Dkt. 50]. Additionally, on March 25, 2021, this Court granted a default judgment against the defendant in his official judicial capacity. [Dkt. 76]. The parties now each move for summary judgment on the plaintiffs' claims against the defendant in his individual capacity.

### III. CONTENTIONS OF THE PARTIES

The plaintiffs contend that they have standing to bring this suit, that the defendant's practice is undertaken with "a primary religious purpose," that it "endorses religion," and that the ceremony is not justified by history or precedent. The plaintiffs also contend that the defendant's courtroom prayer practice is unconstitutionally coercive and unsupported by the settled authorities. On these bases, the plaintiffs seek a summary judgment, declaratory and injunctive relief, and an award of attorney's fees and costs.

The defendant asserts that he is entitled to judgment as a matter of law. He contends that his prayer ceremony does not violate the Establishment Clause. He contends further that the prayer ceremony is "materially indistinguishable" from the facts in *Town of Greece v. Galloway*,[4] *Am. Humanist Ass'n v. McCarty*,[5] and *Am. Legion v. Am. Humanist Ass'n*.[6] Finally, the defendant contends that his ceremony is "non-coercive, non-proselytizing and non-denigrating." Therefore, he is entitled to a summary judgment.

---

[4] 572 U.S. 565, 134 S. Ct. 1811 (2014).

[5] 851 F.3d 521 (5th Cir. 2017).

[6] 139 S.Ct. 2067, 204 L.Ed.2d 452 (2019).

## IV. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the burden at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant bears the initial burden of "informing the district court of the basis for its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003). Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075). "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'" *Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed.2d 127 (1994)). It may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003) (citing *Morris v.*

*Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence . . . is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

V. **ANALYSIS AND DISCUSSION**

As a threshold matter, the Court notes that it has previously ruled that Roe has constitutional standing to sue the defendant and that FFRF has associational standing. [Dkt. 38]. On the merits, as explained herein, the Court is of the opinion that the defendant's opening prayer ceremony violates the Establishment Clause of the federal Constitution.

The First Amendment to the federal Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion[.]" U.S. CONST. amend. I. Through the Fourteenth Amendment, the First Amendment's guarantee applies to state and local government action. *Everson v. Board of Education*, 330 U.S. 1, 8 (1947).

The defendant contends that his opening ceremony is constitutional because it "differs in no meaningful way" from the practices upheld by the Supreme Court in *Marsh v. Chambers* and *Town of Greece v. Galloway*. In *Marsh v. Chambers*, a member of the Nebraska Legislature sued state officials, claiming that the Legislature's practice of opening each session with a prayer, given by a chaplain paid with public funds, violated the Establishment Clause. 463 U.S. 783, 784–85, 103 S. Ct. 3330 (1983). The Court upheld the practice, observing that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.*

More recently, in *Town of Greece v. Galloway*, the Court upheld, as constitutional, a town's practice of opening town board meetings with prayer by local clergy. 572 U.S. 565, 134 S. Ct. 1811 (2014). The Court explained that the town's prayer practice: comported with the

history and tradition of Congress and state legislatures; did not "coerce participation by nonadherents"; and did not "denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." *Id.* at 583. In addition, the Court observed that "[t]he principal audience" for these invocations was "not . . . the public but lawmakers themselves[.]" *Id.* at 587. This Court is of the view that the practice challenged here does not fit within the constitutional boundaries set forth in those precedents.

### A. Courts Conduct Adjudicatory Proceedings.

First, the Court observes that *Marsh*, *Town of Greece*, and the Fifth Circuit's decision in *Am. Humanist Ass'n v. McCarty* considered prayers delivered in a legislative setting. *Marsh*, 463 U.S. 783; *Town of Greece*, 572 U.S. at 594 (Alito, J., concurring) ("[I] do not understand this case to involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding."); *McCarty*, 851 F.3d at 529 (holding, in a case challenging ceremonial prayers delivered at a school board's meetings, that the school board was "[i]n no respect . . . less a deliberative legislative body than was the town board in *Galloway*"). Thus, those cases' outcomes do not inherently control where, as here, the challenged ceremony occurs in an adjudicative setting. Hence, the Court turns to consideration of invocations at or during adjudicative settings.

### B. Public Prayer to Begin Court Proceedings is Not Historical.

The defendant contends that the United States "has a rich historical tradition of opening government proceedings—including judicial proceedings—with solemnizing invocations." In support, the defendant cites historical sources that mention clergy delivering prayers in federal circuit courts in the late 18th century, generally either during a court's inauguration or at the opening of a given term. But the historical practice of prayer delivered by clergy at a one-time, ceremonial event differs from the practice challenged here, where prayer is delivered routinely

before the commencement of court proceedings. Further, in the case at bar, it is the parties with business before the court, not other judges or public officials, who comprise the "principal audience" for the defendant's prayer ceremony. Note Justice Kennedy's comment in *Town of Greece*, 572 U.S. at 587: "The principal audience for these invocations is not, indeed, the public but lawmakers themselves[.]" Hence, the Court determines that the ceremony practiced in the defendant's courtroom cannot be characterized as "an internal act directed at the [government body's] own members." *Contra id.* at 588. Instead, it is directed at those captured in the court's net. The record underscores this point. Attendees in the defendant's courtroom are the prayer's intended audience.

The Court is also not persuaded by the defendant's historical sources discussing prayer ceremonies held in state courts. Those sources, which largely consist of contemporary newspaper articles, for the most part involve prayers given at the opening of a court's term and repeatedly indicate that the practices described were considered unusual by both the articles' authors and the attendees.[7] The Court also rejects the defendant's comparison of his courtroom ceremony with the announcement made in the United States Supreme Court ("God Save the United States and this Honorable Court"). Unlike the invocations regularly delivered in the defendant's courtroom, this refrain has a longstanding history within the Supreme Court as an institution and also does not solicit the participation of the attending public.[8] *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 631 (1989) (O'Connor, J., concurring).

    **C.**    **The Defendant's Ceremony Evinces Coercion.**

---

[7] Indeed, in many of the defendant's sources, dating from the mid-19th century through the late 20th century, the delivery of a prayer during a state court session was apparently so remarkable as to warrant press coverage, in and of itself.

[8] It is noteworthy that the Supreme Court holds proceedings in only 70 to 80 cases per year, whereas the defendant's court is in session much more frequently, on a daily or weekly basis.

Further, the Court is of the opinion that the defendant's ceremony impermissibly coerces the attendees into participating in religious ritual. *See Town of Greece*, 572 U.S. at 586 ("It is an elemental First Amendment principle that government may not coerce its citizens to support or participate in any religion or its exercise." (internal citations omitted)). [9] While not finding support for coercion in *Town of Greece*, the Court held that "the inquiry [into coercion] remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." *Id.* at 587. Here, in contrast to a town board meeting or legislative session, a litigant's, or her attorney's, attendance is not voluntary in any real sense. By failing to attend her court date, a criminal litigant risks the issuance of an arrest warrant, and a civil litigant risks a default judgment or other waiver of rights. An attorney that does not appear for a scheduled court date violates his or her obligations to a client.

The court's installation of signs stating that attendees may leave the courtroom during the opening ceremony does not cancel the coercive pressure created by the ceremony. To start, imposing such a "choice" onto a litigant or her counsel is inherently coercive. Further, even if the Court accepts that the defendant faces away from the attendees during the ceremony, which is substantially disputed,[10] a litigant or attorney cannot reenter the courtroom after the ceremony concludes without drawing the defendant's attention.[11] Given these dynamics, it should not be

---

[9] The Court declines the defendant's invitation to apply the rule proposed by Justice Thomas in his concurring opinion in *Town of Greece*, which states that a violation of the Establishment Clause occurs only when "actual legal coercion" is present. *See Town of Greece*, 572 U.S. at 608–10 (Thomas, J., concurring).

[10] The plaintiff offers the testimony of Roe and two other attorneys who have been in the defendant's court and who state that they have witnessed the defendant observing the audience during the opening ceremony. Attorney Steven Smith, who appeared before the defendant as a litigant in January 2020, states that there was "no question" in his mind that the defendant's observation of him "influenced [the defendant's] demeanor while hearing" his case and that the defendant "acted unprofessional and hostile" to Smith during that hearing.

[11] A court employee, Brandi Lopez, testified that "[o]nce court is in session, [people] would have to knock on the door and let the bailiff run them through security before they could enter the courtroom."

surprising that a litigant or attorney would find the option of leaving the courtroom, only to return and face the judge whose ceremony has been avoided, untenable. Roe's deposition testimony explains his predicament:

> I have a client, and he's sitting here, and he wants me to perform my legal job. He doesn't want me to make a scene, be an activist, or to otherwise make this courtroom prayer a part of what I'm doing that day . . . . The client wants me to follow the rules, to be nice, be courteous, and win his case. If I suddenly got up in the middle of the prayer, and made it a point not to participate in these things, [the client] would be livid with me. And so, just by dint of having the prayer be the centerpiece of the proceedings, means that I would never choose to not participate, if I'm there for a client.

Jane Doe, another attorney who previously appeared in the defendant's courtroom, stated in her declaration that she "would remain in the courtroom during the opening prayer . . . in order to avoid prejudicing Judge Mack against my client." One can easily imagine similar pressures affecting the decision of the litigants, themselves. In sum, the record shows that attendees in the defendant's courtroom are, in essence, a captive audience, illustrating how the "close proximity between" the court's "sectarian exercises and its consideration of specific individual petitions presents, to say the least, the opportunity for abuse." *Lund v. Rowan Cnty.*, 863 F.3d 268, 278 (4th Cir. 2017) (en banc).[12]

### D. The Purpose of the Prayer Ceremony is Non-Secular.

The defendant's ceremony also violates the Establishment Clause because it has both a religious purpose and a primary effect of advancing or endorsing religion. *See Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278–79 (5th Cir. 1996) (citing *Lemon v. Kurtzman*, 91 S. Ct. 2105, 2111 (1971)).[13] In determining the ceremony's purpose and effect, this Court cannot

---

[12] Whether chaplains of diverse faiths deliver prayers in the defendant's courtroom is immaterial, since "the individual freedom of conscience protected by the First Amendment embraced the right to select any religious faith or not at all." *Wallace v. Jaffree*, 472 U.S. 38, 52–53, 105 S. Ct. 2479, 2487–88 (1985).

[13] While the Supreme Court has, with increasing frequency, criticized or declined to apply *Lemon v. Kurtzman*, it has not overruled this longstanding precedent. Most recently, in *Am. Legion v. Am. Humanist Ass'n*, the Court counseled against applying *Lemon* to cases involving "established, religiously expressive

ignore the context leading up to the ceremony's adoption. *Glassroth v. Moore*, 335 F.3d 1282, 1284 (11th Cir. 2003) (noting, in an Establishment Clause case, that "context is the touchstone").

During the 2015 proceedings before the Texas State Commission on Judicial Conduct, the defendant stated that a Prayer Breakfast that he organized, attended by local clergy, related to "a campaign promise made and fulfilled, to open my court with prayer." The defendant also defended his opening ceremony in a 2015 letter to his supporters, stating his view that "the [Chaplaincy] program that I wanted in place was a program that God wanted in place, for His larger purpose."

On these facts, it is "self-evident" that the defendant's purpose in instituting the prayer ceremony was non-secular. *Glassroth v. Moore*, 335 F.3d 1282, 1297 (11th Cir. 2003). Further, a reasonable person who learned of the defendant's statements would naturally conclude that the opening ceremony "has a primary effect of endorsing religion." *See, e.g.*, *Glassroth v. Moore*, 229 F. Supp. 2d 1290, 1303 (M.D. Ala. 2002), *aff'd*, 335 F.3d 1282 (11th Cir. 2003) ("A reasonable observer would know that the Chief Justice [of the Alabama Supreme Court] . . . placed the [Ten Commandments] monument in the Judicial Building rotunda to fulfill his campaign promise 'to restore the moral foundation of law' . . . . [T]he court concludes that a reasonable observer would view the monument's primary effect as an endorsement of religion.").

## VI.  CONCLUSION

The structure of the ceremony, combined with the defendant's attendant statements about the ceremony's purpose, is designed to give attendees "a sense of being in the presence of something . . . holy and sacred[.]" *Glassroth*, 335 F.3d at 1291. The Court is of the view that the defendant violates the Establishment Clause when, before a captured audience of litigants and their counsel, he presents himself as theopneustically-inspired, enabling him to advance, through

---

monuments, symbols, and practices[.]" *Am. Legion*, 139 S. Ct. at 2081. The case before this Court does not involve such a scenario.

the Chaplaincy Program, God's "larger purpose." Such a magnanimous goal flies in the face of historical tradition, and makes a mockery of both, religion and law. Accordingly, the plaintiffs are entitled to a summary judgment. Therefore, the Court declares that the defendant's practice of opening regular court proceedings with religious prayers is unconstitutional. 42 U.S.C. § 1983.[14] Should the defendant violate this Court's declaratory decree, an injunction will issue.

The plaintiffs' motion for summary judgment is **GRANTED**; and the defendant's motion for summary judgment is **DENIED**.

It is so **ORDERED**.

SIGNED on this 20th day of May, 2021.

Kenneth M. Hoyt
United States District Judge

---

[14] ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.").